**William M. COOPER, Jr., and Teresa Cooper, Plaintiffs,**

v.

**Daniel GLICKMAN, Secretary, United States Department of Agriculture, Defendant.**

No. 1:98CV00089.

United States District Court, M.D. North Carolina.

May 11, 1999.

William McCullough, Raleigh, NC, for plaintiffs.

Gill P. Beck, Office of U.S. Attorney, Greensboro, NC, for defendant.

### MEMORANDUM OPINION

BEATY, District Judge.

## I. INTRODUCTION

This matter is before the Court on Plaintiffs William M. Cooper, Jr.'s, and Teresa Cooper's ("the Coopers") Motion for Partial Summary Judgment [Document # 13]. Defendant Daniel Glickman, Secretary of the United States Department of Agriculture ("the Secretary"), has filed a Motion to Strike [Document # 36] and a Motion for Summary Judgment [Document # 30]. As explained further below, this case arises from alleged adverse action taken against the Coopers by an agency of the United States Department of Agriculture. For the reasons stated herein, the Coopers' motion is hereby denied and the Secretary's motions are granted.

## II. FACTUAL AND PROCEDURAL BACKGROUND [1]

The Coopers are North Carolina residents who at various times operated as contract poultry farmers within the state. During the 1980s the Coopers borrowed money from the United States through programs administered by the Farmers Home Administration of the Department of Agriculture ("FmHA").[2] As a result of financial difficulties, the Coopers eventually applied to the FmHA for debt restructuring assistance.[3] On September 14, 1990, the FmHA approved the Coopers' request and, in turn, wrote down a significant portion of their outstanding debt.[4]

---

1. The facts set forth in this section are based upon this Court's review of the Administrative Record [Document # 35] and Plaintiffs' Summary of Administrative Record and Exhibits ("Plaintiffs' Exhibits") [Document # 19]. The Defendant has not contended that any of Plaintiffs' Exhibits are not a part of the Administrative Record. Citations to the Administrative Record are indicated by reference to "A.R." and the relevant Bates stamp number. In some circumstances the Court has cited to Plaintiffs' Exhibits.

2. The duties of the FmHA have since been assumed by the Farm Service Agency. For the purposes of this Memorandum Opinion, all references are made to the "FmHA."

3. As part of the Agricultural Credit Act of 1987, Congress promulgated 7 U.S.C. § 2001, which set forth the debt restructuring and loan servicing program available to farmers who have become delinquent on their government loans. In its current form, the program directs the Secretary to "modify delinquent farmer program loans ... to the maximum extent possible (1) to avoid losses to the Secretary on such loans ... and (2) to ensure that borrowers are able to continue farming...." 7 U.S.C. § 2001(a).

4. In order to be eligible for debt restructuring assistance, four elements must be met. 7 U.S.C. § 2001(b). First, "the delinquency must be due to circumstances beyond the control of the borrower...." Id. § 2001(b)(1). Second, the farmer "must have acted in good faith ... in connection with the [existing indebtedness]...." Id. § 2001(b)(2). Third, the borrower "must present a preliminary plan ... that contains reasonable assumptions that demonstrate" an ability to pay for living and farm operating expenses, and make debt payments. Id. § 2001(b)(3). Fourth, any re-

In connection with the September 14, 1990, restructuring, the Coopers executed three promissory notes totaling $203,136, (A.R.000017, 000022, 000043), and were granted a three-year payment deferral with respect to a significant portion of this new debt, (A.R.000022, 000043).

On August 8, 1994, the Coopers applied to the FmHA for all "primary and preservation loan service and debt settlement programs" available to them. (Pls.' Ex. 1.) On December 15, 1995, the FmHA state office informed the FmHA county office that "primary loan servicing alternatives [would] not assist the [Coopers] to remain on the[ir] farm and/or in the present farming business." (Pls.' Ex. 8.) In lieu of primary loan servicing alternatives, the FmHA state office authorized a "net recovery buyout" offer in the amount of $112,078.69. (*Id.*) [5]

On January 2, 1996, the FmHA county office delivered to the Coopers—based on the December 15, 1995 authorization by the state office—a "Notice of Intent to Accelerate or to Continue Acceleration of Borrowers' Rights" which informed the Coopers that they were "not eligible for debt restructuring." (Pls.' Ex. 9.) [6] Among other things, the notice listed the following five ways in which the Coopers could stop foreclosure: (1) satisfy all outstanding debt payments, (2) request a meeting with an FmHA county official, (3) request an appeal hearing, (4) buy out the outstanding loans at the recovery value, and/or (5) seek consideration for certain other programs. (*Id.* at 3–6.) Specifically, the fourth option, entitled "Buy Out the Loan at Recovery Value," provided as follows:

> You have this option only if the recovery value is greater than the value of the restructuring loan, you cannot repay

structured loan must provide a "net recovery" to the government that is greater than or equal to the "net recovery" to the government that would result from an involuntary liquidation or foreclosure on the property securing the existing loan. *Id.* § 2001(b)(4). A borrower will not be eligible, however, "if the value of the assets calculated under subsection (c)(2)(A)(ii) ... that may be realized through liquidation or other methods would produce enough income to make the delinquent loan current...." *Id.* § 2001(b)(1). Subsection (c)(2)(A)(ii) includes those assets that are not essential for necessary family living expenses, not essential to the operation of the farm, and not exempt from judgment creditors or in a bankruptcy action under Federal or State law. *Id.* § 2001(c)(2)(A)(ii).

**5.** As noted previously, in order to be eligible for debt restructuring assistance, any restructured loan must provide a "net recovery" to the government that is greater than or equal to the "net recovery" to the government that would result from an involuntary liquidation or foreclosure on the property securing the existing loan. In making this determination, the FmHA calculates, pursuant to 7 U.S.C. § 2001(c), both the value of the restructured loan and the recovery value of the collateral securing the loan. The information is processed by the FmHA through computer software known as the Debt Adjustment and Loan Restructuring System ("DALR$"). "If the value of the restructured loan is greater

than or equal to the recovery value [of the collateral securing the loan], the Secretary shall ... offer to restructure the loan obligations of the borrower.... If the borrower accepts such offer ... the Secretary shall restructure the loan accordingly." *Id.* § 2001(c)(5). The recovery value of the collateral securing the loan consists of the value of the secured property, the expenses of liquidating and foreclosure, and other property "specified in any security agreement with respect to [the] loan and the Secretary determines that the value of such property should be included...." 7 U.S.C. § 2001(c)(2). The value of the restructured loan is equal to the "present value of payments that the borrower would make" under the proposed restructured loan. *Id.* § 2001(c)(3)(A). However, if the value of the restructured loan is *less* than the recovery value of the collateral securing the loan then the statute permits delinquent borrowers, in some circumstances, to "buy out" their existing obligations. *Id.* § 2001(c)(6).

**6.** The Secretary is required by the statute to act upon applications in a timely fashion. *See* 7 U.S.C. § 2001(c)(4). In its current form, 7 U.S.C. § 2001(c) specifically provides that the Secretary "shall" make the required calculations, notify the borrower of the results in writing, and provide supporting documentation to the borrower "[w]ithin 90 days after receipt of a written request for restructuring ...." *Id.*

your FmHA debt due to circumstances beyond your control, and you have acted in good faith and tried to keep your loan arrangements with FmHA....

You may buy out your FmHA loan(s) at the recovery value of the property securing the loan and any nonessential assets. The recovery value is $112,-078.69....

. . .

If you are eligible and pay the recovery value, FmHA will write off the rest of your debt up to $300,000....

Time limit. If you are eligible and want to buy out your loan(s) at the recovery value, you must pay FmHA within 90 days from the date you received this letter....

If you appeal the FmHA's adverse decision, the 90–day period to buy out at recovery value will not start until all the appeals are completed....

(*Id.* at 5–6.) This buyout offer ("the January 1996 buyout offer") was consistent with that authorized by the FmHA state office on December 15, 1995.

On February 19, 1996, the Coopers appealed the FmHA's adverse decision—the denial of the Coopers' application for debt restructuring—by completing the appropriate form and mailing it to the FmHA. (Pls.' Ex. 10.)[7] The National Appeals Division of the Department of Agriculture ("NAD") received the Coopers' request on March 4, 1996. (A.R.003409.)

On March 18, 1996, the NAD issued a "Notice of Conclusion of Appeal" ruling that the matter was "not properly" brought. (A.R.003409–10.) In doing so, the NAD noted that "7 CFR [sic][§ ] 11.5(a) requires that all [FmHA] adverse decisions issued at the field service office

be reconsidered or have an informal review conducted by the County or Area Committee with responsibility for the adverse decision at issue, prior to the NAD's accepting an appeal request from the participant." (A.R.003409.) The ruling also indicated that (1) the Coopers had thirty (30) days from March 18, 1996, to request such a review by the county office and (2) the matter was "administratively concluded." (A.R.003409–10.) In addition, the NAD wrote that "[s]hould [FmHA] deny [the Coopers'] request for an informal review, [the Coopers] should notify [the NAD] and request [that] their appeal be reinstated." (A.R.003410.)

On July 15, 1996—more than ninety (90) days after the conclusion of the Coopers' appeal—the FmHA wrote to the Coopers and informed them that they would automatically be considered for certain other programs, such as Homestead Protection. (Pls.' Ex. 14.) As noted previously, consideration for these programs constituted the fifth option to stop foreclosure, as detailed in the January 2, 1996, Notice of Intent to Accelerate or to Continue Acceleration of Borrowers' Rights. Not certain of the nature of this correspondence, the Coopers contacted the FmHA to determine the status of their February 19, 1996, appeal. (Pls.' Ex. 14a at 2.) In response, on August 5, 1996, the FmHA faxed to the Coopers a copy of the March 18, 1996, Notice of Conclusion of Appeal with a handwritten notation that ninety (90) days had passed since the Coopers' appeal had concluded. (*Id.* at 3.)[8] In addition, the FmHA provided the following information to the Coopers:

As per state office this date: What happens next → (1) Homestead Protection

---

7. At various times throughout the debt restructuring application process, a borrower may appeal an adverse FmHA decision to the NAD, 7 U.S.C. § 6991 *et seq.* "On the return of a case to [the FmHA] pursuant to a final determination of the [NAD], the head of the [FmHA] shall implement the final determination not later than 30 days after the effective date of the notice of the final determination." *Id.* § 7000.

8. According to the terms of the January 2, 1996, Notice of Intent to Accelerate or to Continue Acceleration of Borrowers' Rights, the Coopers' right to buy out their loans for $112,078.69 would expire ninety (90) days from the conclusion of their appeal, or June 16, 1996.

will be denied, you will have appeal rights to *Homestead* Protection denial *only* [and] (2) account will be accelerated (no appeal rights)[.] Options: Make debt settlement offer through the [United States] Attorney['s Office] or bid at [the] foreclosure sale[.] Amount of any offer would have to be market value plus any other amount you could reasonably pay. If [the FmHA] buy[s] at [the] foreclosure sale there will be *no* lease-back or buyback rights!

(*Id.* at 2 (emphasis in original).)

The Coopers claimed that they never received a copy of the March 18, 1996, Notice of Conclusion of Appeal and have maintained that, if properly delivered, it was stolen during a rash of mail theft in their community.[9] In light of this contention, the FmHA state office wrote to the NAD on August 12, 1996, inviting it to "review th[e] case to see if the appeal should be re-opened." (Pls.' Ex. 15 at 1.) The letter also provided, in pertinent part, as follows:

The [March 18, 1996,] Notice of Conclusion of Appeal . . . notified the [Coopers] that they had 30 days from the date of the Notice to request an informal review by the FSA County or Area Committee. The [Coopers] never contacted FSA, so we waited the required 90 days for them to pay [the January 1996 buyout offer] and when they did not, we sent them the Preservation Servicing Notices [on July 15, 1996]. They have now contacted us wanting to know what happened to their appeal request. They state that they never received the Notice of Conclusion of Appeal. They have presented evidence to us in the form of a letter from the Chatham County Sheriff Department and a note from their post office . . . which indicates that there has [sic] been problems with mail delivery in their area.

We have reviewed our decision in their case and we have concluded that had they asked for a review of our decision,

that our decision would have remained adverse to them. We have no way to back up and allow them to buyout their loans at Net Recovery Value. It is our understanding that they want to exercise their appeal rights.

(*Id.*) A copy of this letter was mailed to the Coopers.

On August 21, 1996, the NAD issued an "Agency Notice of Request for Appealability Determination." (A.R.003401.) The document stated that the NAD would "render an appealability determination" and that the NAD would "also consider the [FmHA]'s position on why the adverse decision is not appealable if [certain] information is provided [to the NAD by the FmHA]. . . ." (*Id.*) The NAD directed the FmHA to furnish within 15 days "[a] written statement . . . explaining, in detail, why the [FmHA] believes the decision is non-appealable" and "[c]opies of supporting documents and regulations." (*Id.*)

On September 5 and 6, 1996, the Coopers' poultry houses and attachments were destroyed by Hurricane Fran. The Coopers and the FmHA jointly maintained insurance on the houses and attachments which yielded $400,000 in proceeds as a result of the damage. (A.R.003312.)

On September 10, 1996, the NAD issued an "Appealability Determination" ("the September 1996 NAD ruling"), (A.R. 003397–400), which stated, among other things, that

decisions were made by a representative of the [FmHA] and [such] decisions are adverse to the [Coopers]. The [FmHA] has not provided any documentation respective to their [January 2, 1996,] decision to deny the [Coopers]' request for assistance under primary servicing [as was requested in the August 21, 1996, Agency Notice of Request for Appealability Determination]. There are questions of fact and subjective determinations that have been made by the [FmHA] respective to all reasons as set

---

9. In a subsequent ruling, the NAD found that the Coopers had, in fact, never received the

March 18, 1996, document. (Pls.' Ex. 19 at 2.)

forth on the aforementioned adverse decision. Therefore, a hearing must be conducted in order to insure all parties fundamental fairness and the protections required by procedural due process.

(A.R.003398.) The September 1996 NAD ruling made no reference to either the destruction of the Coopers' farm property or the receipt of the insurance proceeds. A hearing was set by the NAD for October 17, 1996, pursuant to the excerpt cited above.

On October 7, 1996, prior to the October 17, 1996, hearing scheduled by the NAD, the FmHA wrote to the Department of Agriculture's Office of General Counsel ("OGC"), requesting legal advice on the Coopers' case. (A.R.003379–80.) Specifically, the FmHA sought the OGC's opinion as to what effect, if any, the destruction of the Coopers' farm property and the receipt of the insurance proceeds had on the status of the Coopers' account. (*Id.*) Among other things, the FmHA wrote:

> Are we limited to collecting the Net Recovery Value of $112,078.69 [as per the January 1996 buyout offer], or can we require that the [Coopers] pay [their] loans in full ... [?] ... If [the Coopers] lose[ ] the pending appeal, [FmHA] regulations would require that we allow [them] to buyout at Net Recovery Value, however, we now have a means to collect the debt in full.

(A.R.003379.)

On October 8, 1996, the OGC responded to the FmHA's request by letter and provided the following advice:

> The insurance is an item of basic security[,] i.e.[,] a substitute for the buildings on which [the FmHA] has a lien. Since [the] Cooper[s] did not accept the [January 1996 buyout offer] ..., you will need to [recalculate the Coopers' financial status] includ[ing] the basic security item of insurance proceeds. Since your security now exceeds the basic debt owed, the borrower will not be entitled to a net recovery buyout of any type and will owe the debt in full since there is sufficient security to pay the debt in full.

(A.R.003376.)

On October 17, 1996, the NAD held the hearing mandated by the September 1996 NAD ruling. Immediately after the hearing a representative of the FmHA hand-delivered a letter to the Coopers. (Pls.' Ex. 18 at 1.)[10] The letter, dated October 16, 1996, purported to withdraw the January 1996 buyout offer. (*Id.*) Among other things, the letter indicated that

> [t]he county office [of the FmHA] has received an opinion from the [OGC] stating that [the FmHA] should withdraw [the] offer in light of the insurance settlement.... The [OGC]'s opinion is that [the FmHA] should treat the insurance settlement from losses on property held as security for our [the FmHA's] loans as *Basic* Security and as such must be included in any Net Recovery Buy Out calculations.

(*Id.* (emphasis in original).)

On November 15, 1996, however, the NAD issued an "Appeal Determination" ("the November 1996 NAD ruling") based upon the evidence presented on October 17, 1996, and concluded, among other things, that the Coopers "ha[ve] 90 days to exercise [the January 1996 buyout offer]." (A.R.003349.) Therefore, according to the November 1996 NAD ruling the Coopers could exercise the January 1996 buyout offer by February 13, 1997.[11]

---

10. The record before the Court appears to indicate that the FmHA attempted to present this letter to the NAD at the start of the hearing but was unable to do so. According to notes identified in the record, "[c]omments by [the NAD] Hearing Officer at [the] beginning of [the] hearing [p]recluded [the][i]ntroduction [of the letter] as evidence." (A.R. 003361.)

11. The Court notes that the Coopers do not indicate in their summary judgment briefs whether they physically attempted to exercise the buyout offer approved by the November 1996 NAD ruling by February 13, 1997. The Court further notes, however, that due to the position asserted by the FmHA on December 4, 1996 (*discussed below*), any attempt to do so would have been futile and, thus, any failure to make such an attempt would not render their claims invalid.

Despite the NAD's determination that the January 1996 buyout offer could be exercised within 90 days, the FmHA chose to ignore the November 1996 NAD ruling and, by letter dated December 4, 1996, informed the Coopers that they would not be allowed to exercise the buyout option. (Pls.' Ex. 20.) Specifically, the FmHA wrote "that the [FmHA] position on this matter remains unchanged.... As Mr. Cooper will recall[,] [the October 16, 1996,] letter withdrew the [January 1996 buyout offer].... " (*Id.*)

On February 10, 1997, the FmHA, consistent with the recommendation of the OGC, recalculated the Coopers' eligibility for debt restructuring or buyout, incorporating the $400,000 insurance proceeds. (Pls.' Ex. 21.) Based upon the results of this recalculation, the FmHA, on February 13, 1997, issued a second Notice of Intent to Accelerate or to Continue Acceleration of Borrowers' Rights. (Pls.' Ex. 22.) This document, like the notice issued on January 2, 1996, informed the Coopers that they were not eligible for debt restructuring and that they could appeal that decision. (*Id.* at 1–3.) Unlike the January 2, 1996, notice, however, the document did not offer the Coopers the option of buying out their loans. (*Id.* at 3–4.) On February 18, 1997, the Coopers responded to the FmHA notice by requesting a meeting with an FmHA credit official and by appealing the FmHA's decisions to the NAD. (Pls.' Ex. 23.)

The NAD held the Coopers' requested hearing on May 7, 1997, and issued its Appeal Determination on June 2, 1997 ("the June 1997 NAD ruling"). (Pls.' Ex. 25.) In the June 1997 NAD ruling, the NAD defined the scope of the appeal as

follows: "The adverse decision at issue is whether the [FmHA] properly decided [on January 2, 1996,] to accelerate the [Coopers'] indebtedness and deny his request for debt restructuring." (*Id.* at 1.) Primarily because the February 10, 1997, calculation was made according to a Farm and Home Plan dated August 14, 1995, the NAD concluded that the FmHA "erred in that it did not use . . . current . . . financial information in processing the [Coopers'] request for debt restructuring." (*Id.* at 2.) The NAD found that the Coopers' operations "changed significantly" when their poultry houses and attachments were destroyed by Hurricane Fran. (*Id.*) Based on these conclusions, the NAD directed the FmHA to "process the [Coopers'] application for Primary Loan Services by using . . . current [financial information] in accordance with regulations." (*Id.*) Significantly, the NAD also found that "[t]he [FmHA], per letter dated October 16, 1996, withdrew the [January 1996 buyout offer] . . . 'in light of the insurance settlement.' " (*Id.* at 1.)

On June 30, 1997, an FmHA representative wrote to the NAD requesting that the NAD Director review the June 1997 NAD ruling, despite the fact that the decision favored the FmHA's position. (A.R. 003147–49.) The FmHA representative argued that "[n]either statute, nor [FmHA] regulation, nor NAD regulation binds [the FmHA] to honor a buyout offer when the borrower's financial circumstances change significantly before the transaction is consummated. In addition, the 1996 [Federal Agriculture Improvement and Reform] Act [('the FAIR Act')] prohibits buyout[s] for borrowers who have received previous debt forgiveness." (A.R.003148.) [12]

---

**12.** On April 4, 1996, Congress promulgated the FAIR Act, which amended the laws authorizing loan assistance to farmers. Among other things, the FAIR Act added 7 U.S.C. § 2008h, entitled "Loan and Loan Servicing Limitations":

(a) Delinquent borrowers prohibited from obtaining direct operating loans—The Secretary may not make a direct operating loan under subchapter II of this chapter [Operating Loans] to a borrower who is delinquent on any loan made or guaranteed under this chapter [Agricultural Credit].

(b) Loans prohibited for borrowers that have received debt forgiveness—

(1) In general—Except as provided in paragraph (2), the Secretary may not make or guarantee a loan under this chapter to a borrower who received debt forgiveness on a loan made or guaranteed under this chapter.

On July 30, 1997, the Acting Director of the NAD, Robert J. Day, Jr. ("Day"), denied the FmHA's June 30, 1997, request for Director review on procedural grounds. (A.R.003077.) Day rejected the request because the NAD's rules provided that "agency review requests may only be made by the head of an agency or by a person acting in such capacity." (*Id.*) He wrote that there was no indication as to whether the author of the request "was acting in the capacity of Administrator...." (*Id.*) Despite denying the FmHA's review request, however, Day wrote that

> [t]he [FAIR Act] prohibits the advancing of funds to delinquent borrowers who [have] received a prior write down of debt. The parties are advised that the provisions of [FAIR Act] are implicated in this matter and that NAD appeal procedures may not be used to seek a review of statutes or USDA regulations.

(*Id.*) Notably, he concluded his letter ("the July 1997 Day letter") by reminding the FmHA that it "has responsibility for implementing the [June 1997 NAD ruling] within 30 days of receipt of this letter.... Implementation requires the [FmHA] to move to the next step in considering Mr. Cooper's application and may include con-

sideration of any changes in the participant's situation." (*Id.*)

On September 11, 1997, the FmHA county office began "implementing" the June 1997 NAD ruling by requesting new financial information—which would include a new Farm and Home Plan—from the Coopers. (A.R.000213–14.) The FmHA requested that the Coopers provide the information within 30 days. (A.R. 000214.) [13]

On December 11, 1997, the FmHA issued to the Coopers a "Notification of Intent to Accelerate or to Continue Acceleration of Loans and Notice of Your Rights" ("the December 1997 FmHA notice"). (A.R.000153–56.) Among other things, the notification indicated that the FmHA would accelerate the Coopers' loans because they "ha[d] not asked or ha[d] not accepted the offer for primary loan service programs." (A.R.000153.) In addition, it informed the Coopers that the FmHA would "take legal action to collect the money ... owe[d]." (A.R.000154.) The FmHA also advised the Coopers that they could stop foreclosure and acceleration by appealing the FmHA's decision. (A.R.000154–55.) The Coopers responded by making such an appeal request.

> (2) Exception—The Secretary may make a direct or guaranteed farm operating loan for paying annual farm or ranch operating expenses of a borrower who was restructured with a write-down under section 2001 of this title.
> (c) No more than 1 debt forgiveness for a borrower on a direct loan—The Secretary may not provide to a borrower debt forgiveness on a direct loan made under this chapter if the borrower has received debt forgiveness on another direct loan made under this chapter.
>
> 7 U.S.C. § 2008h. This section was further amended by Section 801 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub.L. No. 105–277, 112 Stat. 2681 (1998). However, those changes are not relevant to this action.
>
> **13.** On October 2, 1997, the Coopers inquired as to whether they could obtain a 30–day extension to comply with the request. (A.R.

0002209.) In response, the FmHA county representative, on October 8, 1997, advised the Coopers that she did "not have the authority to grant" such an extension. (A.R. 000207.) On October 10, 1997, the Coopers wrote to the FmHA county office providing some of the information requested and seeking further clarification of their options. (A.R.000188–92.) On October 21, 1997, the FmHA informed the Coopers, among other things, that they could "request an extension of the 30 day time limit" from the state office "through" the county office. (A.R.000206.) On October 24, 1997, the Coopers responded and requested such an extension, even though they asserted that they had "already requested [an] extension in a previous letter to you [dated October 2, 1997]...." (A.R. 000164.) By memorandum dated November 14, 1997, the FmHA state office informed the county office that it had rejected this request. (A.R. 000157)

On January 29, 1998, the Coopers initiated this action, alleging the following claims for relief: (1) unlawful calculation and denial of net recovery buyout, (Compl.¶¶ 103–09), (2) violation of FmHA procedures, (*id.* at ¶¶ 110–17), (3) agency refusal to implement NAD decision, (*id.* at ¶¶ 118–23), (4) unlawful acceleration, (*id.* at ¶¶ 124–28), and (5) due process (*id.* at ¶¶ 129–30). The Coopers requested in their Complaint that this Court (1) enjoin the Secretary from accelerating the loans or foreclosing on their property, (2) issue a declaratory judgment that they are entitled to buy out their loans for $70,000 within 90 days of such judgment, (3) issue a declaratory judgment that the Secretary's actions were arbitrary, capricious, and not in accordance with the law, and (4) award the Coopers attorney fees, costs, and expenses. (*Id.* at 27–28.) They further requested, if this Court were to find that the Coopers are not entitled to buy out their loans, that this Court issue a declaratory judgment that (1) they are entitled to rebuild their poultry business with the insurance proceeds, (2) the Secretary must consider their restructuring application based on current circumstances (including any rebuilt business), and (3) the Secretary's threats of acceleration of loans and foreclosure were unlawful and void. (*Id.*)

On May 7, 1998, the NAD stayed the Coopers' appeal of the FmHA's decision to issue the December 1997 FmHA notice, pending the outcome of the instant action. (Pl.'s Ex. 30.)

On September 3, 1998, the Coopers filed a Motion for Partial Summary Judgment now before this Court. The Coopers also filed a declaration by William M. Cooper, Jr. [Document # 17], in support of their position. The Motion for Partial Summary Judgment is directed at the Coopers' claims for unlawful calculation and denial of net recovery buyout, violation of FmHA procedures, agency refusal to implement NAD decision, and due process. On October 19, 1998, the Secretary filed a Motion for Summary Judgment and a Motion to Strike, both of which are now before this Court. The Motion to Strike is directed at the September 3, 1998, declaration by William M. Cooper, Jr.

On November 3, 1998, the parties filed a Joint Motion for Partial Dismissal [Document # 40] which, among other things, requested dismissal of the Coopers' fourth claim, unlawful acceleration. The Court did so pursuant to an order dated November 12, 1998.[14]

## III. JURISDICTION

 Pursuant to the Administrative Procedures Act ("APA"), "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Although the Secretary did not brief the point, in his Amended Answer and Counterclaim he asserted as an affirmative defense that the Coopers' "have failed to exhaust their administrative remedies" and, thus, this Court "lacks subject matter jurisdiction...." (Am. Answer & Countercl. at 18.) An FmHA decision to deny a borrower either a restructuring or buyout is plainly reviewable as a final agency action. *See, e.g., Chamblee v. Espy,* 100 F.3d 15, 18 (4th Cir.1996) (FmHA decisions constituted final agency action when their

14. On May 13, 1998, the Secretary answered the Coopers' complaint and asserted a counterclaim of "default," requesting that this Court (1) render judgment against the Coopers in the amount of their outstanding debt, (2) order an accounting of the insurance proceeds received as a result of damage to the Coopers' farm property, and (3) order that the insurance proceeds be held in trust until the Coopers' outstanding debt is paid. (Answer & Countercl. at 18.) On September 30, 1998, the Secretary amended his Answer, adding a counterclaim of "foreclosure," and further requesting that this Court issue an order allowing judicial foreclosure. (Am. Answer & Countercl. at 19–21.) This Court's November 12, 1998, order also dismissed, without prejudice, both of the Secretary's counterclaims, pursuant to the November 3, 1998, Joint Motion for Partial Dismissal. As such, the Secretary's counterclaims are no longer a part of this action.

practical effect was to deny applicant loan servicing). Thus, despite the Secretary's affirmative defense assertions, this Court plainly has jurisdiction to review this case. Furthermore, any "preliminary, procedural, or intermediate agency action or ruling not directly reviewable" is also reviewable by this Court. 5 U.S.C. § 704.

## IV. MOTION TO STRIKE

Before discussing the parties' summary judgment motions, the Court will address the Secretary's Motion to Strike. As noted above, on September 3, 1998, the Coopers filed a declaration by William M. Cooper, Jr. With his Motion to Strike, the Secretary requests this Court to exclude the declaration from consideration.[15] The Coopers argue that the declaration should be considered because (1) it constitutes helpful "background information ... extract[ing relevant information] from an extraordinarily voluminous and complex record consisting of over 4000 pages," (2) the Defendant's actions are not adequately explained by the record, (3) the FmHA failed to consider factors which were relevant to its final decision, and (4) the FmHA has been sued for failure to take action. (Pls.' Resp. to Def.'s Br. in Supp. of Mot. to Strike Decl. of William M. Cooper, Jr., at 3-4.) In response, the Secretary asserts that "[i]t takes needless time to attempt to go through extraneous evidence such as Plaintiff's declaration, which Defednant [sic] does not agree ... accurately reflects the administrative record." (Def.'s Reply Br. in Supp. of Def.'s Mot. to Strike Decl. of William Cooper at 1.)

In reviewing an agency decision a district court "shall review the whole record or those parts of it cited by a party...." 5 U.S.C. § 706. Accordingly, a district court's factual review is generally limited to the administrative record. As the Supreme Court has stated:

"[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." The task of the reviewing court is to apply the appropriate ... standard of review ... to the agency decision based on the record the agency presents to the reviewing court.

*Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743-44, 105 S.Ct. 1598, 84 L.Ed.2d 643, 656 (1985) (citations omitted) (first alteration in original).

If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

*Id.* at 744, 105 S.Ct. 1598, 84 L.Ed.2d at 656. Despite the Supreme Court's instruction, "it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective." *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989); *see also id.* at 991 n. 166. The decision to do so, however, is soundly within the discretion of the reviewing court. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136, 156 (1971).

Here, the declaration by William M. Cooper, Jr., merely provides a chronological summary of the alleged facts of the case, similar to that set forth in the Complaint and various briefs. This Court recognizes that the administrative record in this case spans several volumes without any formal table of contents or index. Nonetheless, the Court has been able to locate sufficient documentation as was necessary to perform a proper review. Therefore, the information provided in the declaration at issue would not assist the Court in addressing the issues raised by the parties. Accordingly, this Court con-

---

15. Although the Secretary sets forth various legal standards in support of his motion, he fails to explain in his Brief in Support of

Motion to Strike Declaration of William M. Cooper, Jr., exactly why the declaration should be excluded from this Court's review.

cludes that the Secretary's Motion to Strike is granted. As such, the Court will exclude the declaration from the factual record before it.[16]

## V. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, the Court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield,* 67 F.3d 53, 56 (4th Cir.1995), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). Judges are not "'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202, 213 (1986) (quoting *Schuylkill & Dauphin Imp Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1871)).

■ Pursuant to the APA, this Court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Agency action will be set aside if it is found to be "arbitrary, capricious, an abuse of discretion, contrary to law or unsupported by substantial evidence." *Leitman v. McAusland,* 934 F.2d 46, 48 (4th Cir.1991).[17] As the Fourth Circuit has stated,

> [i]n determining whether agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," [a court] perform[s] "only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes," and whether the agency has committed "a clear error of judgment." "[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

*Maryland Dep't of Human Resources v. United States Dep't of Agric.,* 976 F.2d 1462, 1475 (4th Cir.1992) (citations omitted) (last alteration in original). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842, 852 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83

---

**16.** Although this Court grants the Secretary's Motion to Strike, the Court notes that the reference to *Flue–Cured Tobacco Cooperative Stabilization Corporation et al. v. United States Environmental Protection Agency et al.,* 6:93CV00370 (M.D.N.C. May 23, 1995), does not serve to support the Secretary's position. In *Flue–Cured Tobacco,* the plaintiffs were "seek[ing] wholesale discovery" to supplement the existing administrative record. *Id.* at 18. Here, the Coopers merely sought to add to the record an eight-page declaration summarizing certain facts.

**17.** The relevant statute provides in part that the reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
5 U.S.C. § 706.

L.Ed. 126, 140 (1938)). As noted previously, in reviewing an agency decision a district court "shall review the whole record or those parts of it cited by a party. . . ." 5 U.S.C. § 706.

■ To the extent this Court must review an agency's construction of a statute, this Court must give effect first to the unambiguously expressed intent of Congress. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694, 702–03 (1984). If Congress has not addressed the precise issue,

> the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. . . .
>
> [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Id.* at 843–44, 104 S.Ct. 2778, 81 L.Ed.2d at 703 (footnotes and citations omitted); *see also Akindemowo v. INS,* 61 F.3d 282, 284–85 (4th Cir.1995).

## VI. DISCUSSION

As noted previously, the Coopers assert that the FmHA, on behalf of the Secretary, (1) unlawfully calculated and denied them a net recovery buyout, (2) refused to implement a NAD decision, (3) violated FmHA procedures, and (4) violated the Coopers' due process rights.[18] This Court will address each allegation in turn.

### A. *The FmHA's Decision to Deny the Coopers' a Net Recovery Buyout*

The Coopers first allege that the FmHA unlawfully calculated and denied them a net recovery buyout to which they were entitled. As noted previously, the December 1997 FmHA notice indicated that the FmHA would accelerate, and take legal action to collect on, the Coopers' loans. This "final agency action" denied the Coopers a buyout option.[19] At the outset, the Court notes that, pursuant to the June 1997 NAD ruling, the January 1996 buyout offer was withdrawn by the FmHA per its letter dated October 16, 1996. As a result, as of October 16, 1996, there was no existing buyout offer that the Coopers could accept.

The decision to make any buyout offer is driven by the results of the DALR$ computer program. As noted previously, a buyout option will only be available if the value of any restructured loan is *less* than the recovery value of the collateral securing the loan. *See* 7 U.S.C. § 2001(c)(6). Accordingly, the crux of the Coopers' complaint is that the information input into the DALR$ computer program was incorrect. Specifically, the Coopers contend that the $400,000 of insurance proceeds should not have been included in the DALR$ analysis, the results of which led to the December 1997 FmHA notice. The FmHA's decision to include the insurance proceeds in its calculations was based upon its view that "it can take into consideration changes in circumstances in administering its programs." (Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. at 10.) As neither party asserts that there exists a genuine issue of material fact, this Court's inquiry is to determine whether the FmHA's decision to consider that information when it analyzed the Coopers' financial position was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### 1. The Coopers' Arguments

With respect to this issue, the Coopers assert that (1) a consideration of changed

---

18. The Court again notes that the Coopers' fourth cause of action, unlawful acceleration, was dismissed on November 12, 1998.

19. The Coopers appealed the decisions detailed in the notification, but the NAD has since stayed that appeal pending the outcome of the instant action.

circumstances directly violates the existing statutes and regulations governing this area and (2) the FmHA's implementation of such a policy constitutes invalid rulemaking because there has been no compliance with the relevant notice and comment requirements. (Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. at 12–15.) As discussed below, this Court finds both of the Coopers' arguments unavailing.

Specifically with respect to the Coopers' first argument cited above, they contend that the Secretary's decision to include changed circumstances when considering debt restructuring assistance constitutes

> an effort by [the Secretary] to simply ignore the clear requirements of both the legislation which established [the NAD] and its predecessor agencies and, indeed, the substance of the [Department of Agriculture]'s own published regulations.... [T]he clear language of the statutes and regulations t hemselves—unembellished by "interpretation"—gives no support to the [Secretary]'s argument. *Nowhere* in the statutes or regulations governing the implementation of ... NAD decisions does the term—or concept of— "changed circumstances" exist.

(Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. at 12 (emphasis in original).)

In support of the above contention, the Coopers cite *First National Bank v. Glickman,* No. 5–97–CV–133–C (N.D.Tex. Apr. 3, 1998), an unpublished decision from outside the Fourth Circuit. While recognizing that the decision is not binding on this Court, the Court nevertheless finds that the Coopers' reliance on *First National Bank* is misplaced. According to the facts as set forth by the district court, the Secretary, while implementing a NAD ruling, "instructed the state [FmHA] official to 'update' all financial information and to base or create a 'revised' financial plan based on 'current marketing plans.'" *Id.* at 5. The district court eventually held that this decision was arbitrary, capricious, and not in accordance with the law. *Id.* at 21. Central to the district court's reason-

ing in *First National Bank,* however, was the fact that the NAD's ruling did not explicitly authorize the FmHA to consider changed circumstances when it implemented the NAD ruling. *See id.* at 5 ("None of the[ ] instructions [requesting updated financial information] were authorized or required by the [NAD] hearing officer's decision."). By contrast, in this case the instructions set forth in the June 1997 NAD ruling specifically directed the FmHA to "process the [Coopers'] application for Primary Loan Services by using ... *current* [financial information]...." (Pls.' Ex. at 2 (emphasis added).)

The Coopers' second argument addressing this issue is that the FmHA's stated policy of considering changed circumstances constitutes rulemaking and, since there has been no compliance with the relevant notice and comment requirements with respect to that policy, it is unenforceable against the Coopers. (Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. at 14–15.) This Court disagrees. Pursuant to the APA, an agency issuing a proposed rule must afford notice of the proposed rule and an opportunity for public comment. 5 U.S.C. § 553. There are no such requirements, however, for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice...." *Id.* at § 553(b)(3)(A). As the Fourth Circuit has explained, "interpretative rules simply state what the administrative agency thinks a statute means, and only remind affected parties of existing duties.... A rule is a general statement of policy if it does not establish a binding norm and leaves agency officials free to exercise their discretion." *Chen Zhou Chai v. Carroll,* 48 F.3d 1331, 1340–41 (4th Cir.1995) (citations omitted).

In *Chen Zhou Chai,* the Fourth Circuit considered, among other things, whether the revocation of an interim rule promulgated by the United States Attorney General violated the notice and comment requirements of the APA. The interim rule had amended existing regulations govern-

ing asylum for aliens. *Id.* at 1336. Specifically, the interim rule added a new burden of proof regulation with respect to asylum based on an applicant's opposition to a country's family planning policies. *Id.* at 1336–37. In concluding that the revocation did not require notice and comment procedures, the Fourth Circuit found that the interim rule fell within the exemption set forth by 5 U.S.C. § 553(b)(3)(A):

> The ... interim rule did not create a binding norm but merely provided that the Attorney General may grant asylum to aliens who have a well-founded fear that they will be forced to abort a pregnancy or to undergo sterilization. Administrative authorities retained the discretion to deny asylum to aliens who established eligibility under the interim rule. Because the ... interim rule was a general statement of policy, we conclude that the Attorney General could revoke the rule without completing the notice and comment requirement of the APA.

*Id.* at 1341 (citation omitted).

■ In light of the above reasoning, this Court similarly concludes that the Secretary's consideration of changed circumstances in its implementation of debt restructuring procedures "does not establish a binding norm and leaves agency officials free to exercise their discretion." *Id.* Like the interim rule in *Chen Zhou Chai*, the Secretary's position merely provides that the FmHA *may* consider changed circumstances when appropriate and, thus, agency officials remain free to exercise their discretion. As a result of this conclusion, the Secretary's consideration of changed circumstances is more appropriately char-

acterized as a "statement of policy" and, therefore, 5 U.S.C. § 553 is not implicated.[20]

### 2. The FmHA's Consideration of Changed Circumstances

This Court will now directly evaluate the FmHA's decision to consider the financial effect of the destruction of the Coopers' farm property—that is, the receipt of $400,000 of insurance proceeds—when it determined whether the Coopers' could receive debt restructuring or a buyout. Specifically, the Court will address the question of whether that decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

As noted previously, an agency decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law when the agency fails to conform with the controlling statutes and has committed a clear error of judgment. *See Maryland Dep't of Human Resources v. United States Dep't of Agric.,* 976 F.2d 1462, 1475 (4th Cir.1992). Furthermore, when reviewing an agency's construction of a statute, a court must perform the two-step inquiry mandated by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, has Congress "directly spoken to the precise question at issue[?]" *Id.* at 842, 104 S.Ct. 2778, 81 L.Ed.2d at 702–03. Second, "if the statute is silent or ambiguous with respect to the specific issue," then is the agency's interpretation "based on a permissible construction" of the relevant statutory provi-

---

**20.** *Dalton v. United States,* 816 F.2d 971 (4th Cir.1987), cited by the Coopers, is wholly distinguishable from the instant action. In *Dalton,* the Fourth Circuit concluded that a memorandum issued by an agency representative without any notice and comment procedures was "an invalid and ineffective modification or repeal" of both the federal food stamp statute and its corresponding regulations. *Id.* at 975. In its ruling, the Fourth Circuit concluded that pursuant to the memorandum in question, "the reviewing officer was denied any right to exercise the discretionary power to impose a civil money penalty in lieu of disqualification [as allowed by the statute].... The ... memorandum was in effect an attempted regulation which robbed the reviewing officer of that discretion which the statute and the existing properly-adopted regulation had provided for." *Id.* Here, however, the Secretary's policy of considering changed circumstances is not contrary to the relevant statutes and regulations and does not "rob[ ] the reviewing officer" of discretion.

sion? *Id.* at 843, 104 S.Ct. 2778, 81 L.Ed.2d at 703.

The Court notes that the Coopers do not specifically address step one of the *Chevron* inquiry. At best, they argue that the changed circumstances policy is inconsistent with the statutes promulgating the NAD which, among other things, require that final NAD determinations be effective "as of the date of filing of an application, the date of the transaction or event in question, or the date of the original adverse decision, whichever is applicable." 7 U.S.C. § 6998(e). They contend that the Secretary "seeks ... to convince the [C]ourt that the 'date of the transaction' ... within the meaning of ... § 6998 is the *future* date of the actual implementation of the Cooper's Recovery Value Buyout." (Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. at 13 (emphasis in original).) However, such an assertion, based on an interpretation of the statutes establishing the effective dates of NAD rulings, does not suggest to this Court that Congress has "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778, 81 L.Ed.2d at 702–03. Rather, the Court finds that there is no statutory language which specifically addresses the type of situation involved in this instance, to wit, the occurrence of material and significant changed circumstances arising during the course of a NAD appeal process. As a result of the absence of specific language covering this type of incident, the Court finds that Congress has not spoken directly to this issue.

The Court therefore, must turn to step two of the *Chevron* inquiry and consider whether the FmHA's policy of considering changed circumstances is based upon a permissible interpretation and construction of the statutes.[21]

■ As discussed previously, 7 U.S.C. § 2001 provides the framework from which the FmHA determines whether a farmer is eligible to receive debt restructuring and loan servicing. Specifically, § 2001(a) sets forth the general guidelines and goals of the program and § 2001(b) lists the requirements for eligibility. Among the eligibility requirements is § 2001(b)(4) which, as detailed previously, necessitates the generation of a DALR$ report using financial information provided to the FmHA. For the purposes of determining whether the Coopers' were eligible for debt restructuring or a buyout offer, the FmHA ran a DALR$ report and included the $400,000 of insurance proceeds in that analysis. Again, it is this consideration of changed circumstances that is at the heart of this dispute.[22] Although § 2001(b)(4) neither explicitly authorizes "consideration of changed circumstances" nor mandates the use of "current" financial information, this Court finds that such a practice is neither arbitrary, capricious, an abuse of discretion, nor contrary to law. Rather, it amounts to a reasonable method of implementation, especially in situations such as that before the Court, where the financial situation of an applicant has so significantly changed that to proceed with old finan-

---

21. The Court notes that although the Coopers' attempt to argue, by focusing on 7 U.S.C. § 6998(e), that Congress has spoken to the issue at hand, they essentially concede that Congress has not done so: *"Nowhere* in the statutes or regulations governing implementation of ... NAD decisions does the term—or concept of—'changed circumstances' exist." (Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. at 12 (emphasis in original).)

22. With respect to step two of the *Chevron* inquiry, the Secretary argues that as follows:

Pursuant to 7 U.S.C. [§ ] 2001(b), [the Department of Agriculture] has determined that it may consider change of circum-

stances when a borrower receives $400,000 in insurance proceeds, the delinquency is not ·"due to circumstances beyond the control of the borrower, as defined in regulations issued by the Secretary" as explained by [the Department of Agriculture's] OGC ..., and [the Department of Agriculture]'s interpretation establish[es] a rational connection between the [the Department of Agriculture]'s interpretation of 7 U.S.C. [§ ] 2001[ ] and its implementing regulations to ensure that the purpose of 7 U.S.C. [§ ] 001(a)(1) of "avoiding loss to the Secretary" is achieved.

(Def.'s Reply Br. of Def.'s Mot. for Summ. J. at 5–7.)

cial data would inaccurately represent the actual financial position of a delinquent borrower and result in significant losses to the Government. A policy of consideration of changed circumstances is, at least in this case, consistent with a primary statutory goal as specified by Congress: "The Secretary shall modify delinquent farmer program loans ... to the maximum extent possible ... *to avoid losses* to the Secretary on such loans...." 7 U.S.C. § 2001(a)(1) (emphasis added).

The Court's conclusion—that the FmHA's decision to include the $400,000 of insurance proceeds in its DALR$ calculation was neither arbitrary, capricious, an abuse of discretion, nor contrary to law—is further supported by *Kinion v. United States*, 8 F.3d 639 (8th Cir.1993). The Kinions were farmers who had become delinquent on their government loans. On January 4, 1989, the Kinions requested consideration for possible debt restructuring. *Id.* at 640. On March 3, 1989, the FmHA county supervisor, without the state supervisor's authorization, informed the Kinions that they were ineligible for loan restructuring but could buy out their loans for $79,836. *Id.* On March 5, 1989, a significant portion of the Kinions' farm was destroyed by a storm. *Id.* As a result, they received $264,000 of insurance proceeds. *Id.* Based on these changed circumstances, the FmHA county supervisor recalculated the Kinions' January 4, 1989, application and, on November 15, 1989, informed the Kinions that they would only be permitted to buy out their loans for $306,365, not $79,836. *Id.* at 641. The Kinions argued that the FmHA was bound by the original buyout offer because (1) the county supervisor had proper authority to accept a buyout and (2) the FmHA was only permitted to consider information "in

existence and of record" within the 60 days of their request for loan servicing.[23] *Id.* Specifically with respect to the Kinions' second argument, they asserted "that FmHA action taken based on information acquired after th[e] sixty-day period is contrary to the statute and therefore constitutes action that is arbitrary, capricious, and not in accordance with the law." *Id.* at 643. In rejecting this argument, the Eighth Circuit held "that the FmHA's recalculations of the net recovery value using information gained after the sixty-day period was not improper." *Id.* at 644. This ruling was based on the court's predicate holding that, "where the FmHA delay resulted in part from an independent act of God, ... the FmHA did not lose jurisdiction [to act] after the sixty period." *Id.*[24]

Furthermore, the FmHA, by including the $400,000 insurance proceeds in the Coopers' DALR$ calculation, was complying with the earlier June 1997 NAD ruling which directed the FmHA to "process the [Coopers'] application for Primary Loan Services by using ... *current* [financial information]...." (Pls.' Ex. 25 (emphasis added).) In support of this directive, the NAD hearing officer concluded that

[t]itle 7 of the Code of Federal Regulations (CFR), Part 1951[,] subpart S, section 1951.907(f)(5)(i), requires the [FmHA] to use current financial information in the consideration of primary loan service programs. 7CFR [sic][§ ] 1924, subpart B, section 1924.56(b)(3)[,] requires that a completely new farm business plan be developed whenever significant changes occur in the operation. Notice FC–18, dated January 23, 1996, states that an application should be updated when there is a sufficient evidence that the operation has changed

---

**23.** Pursuant to 7 U.S.C. § 2001(c)(4), the Secretary must act upon a written request for restructuring within ninety (90) days of receipt of such a request. At the time the Kinions applied for restructuring this statutory window was sixty (60) days.

**24.** The Coopers contend that *Kinion* is wholly distinguishable from the case at bar because

the state supervisor in that case did not approve the original buyout offer. This Court disagrees. The Eighth Circuit's response to the Kinions' second argument is persuasive to the extent that it supports a finding that the FmHA's consideration of the $400,000 of insurance proceeds received by the Coopers was similarly neither arbitrary, capricious, an abuse of discretion, nor contrary to law.

significantly, and that the Farm and Home Plan and DALR$ be revised accordingly.

(Pls.' Ex. 25 at 2.) [25] Significantly, the June 1997 NAD ruling appears to be the only appeal determination issued in this case which considered the effects, if any, the destruction of the Coopers' farm property had on their debt restructuring efforts. (Pls.' Ex. 25 at 1.) A close review of the November 1996 NAD ruling—on which the Coopers' rely heavily—reveals no mention of the September 1996 hurricane incident, despite the fact that the corresponding hearing was held on October 17, 1996, more than one month *after* the Coopers' farm was destroyed.

In summary, with respect to the Coopers' allegation that the FmHA unlawfully calculated and denied them a net recovery buyout, this Court notes that the FmHA's decision was based upon the results of a DALR$ calculation which considered significant changed circumstances, that is, the

destruction of the Coopers' farm property and the receipt of $400,000 of insurance proceeds. This Court finds that the inclusion of this current financial information in the FmHA's calculations was neither arbitrary, capricious, an abuse of discretion, nor contrary to law. [26] As a result, the Secretary's Motion for Summary Judgment with respect to the Coopers' claim for unlawful calculation and denial of a net recovery buyout is granted and the claim is dismissed with prejudice. Accordingly, the Coopers' Motion for Partial Summary Judgment filed with respect to this claim is denied. [27]

### B. The FmHA's Alleged Refusal to Implement a NAD Decision

■ The Coopers next allege that the FmHA unlawfully refused to implement a NAD decision. As discussed earlier, the November 1996 NAD ruling indicated, among other things, that the Coopers had ninety (90) days to exercise the January

---

**25.** The first regulation cited—7 C.F.R. § 1951.907(f)(5)(i)—has since been re-codified at 7 C.F.R. § 1951.907(e)(5)(ii) and now reads, in pertinent part, as follows:

> Request for primary and preservation loan service programs.... An application for loan service programs must include the following forms ... and data, unless the information is already in the borrower's case file and still current, as determined by the approval official: ... Form 410–1, "Application for FmHA Services," *including a current (within 90 days) financial statement* of all individuals and entities personally liable for the FLP debt.

7 C.F.R. § 1951.907(e)(5)(ii) (emphasis added). The second regulation cited—7 C.F.R. § 1924.56(b)(3)—currently provides, in pertinent part, as follows:

> Documentation and revision of plans. Individuals must submit a farm business plan to the [FmHA], upon request, for loan approval and servicing purposes.... Form FmHA 1962–1 ... will be revised whenever *significant changes* occur during the year that will affect repayment ability. It is the individual's responsibility to notify the Agency of any necessary changes. *If the changes would result in a major change in the operation, a completely new farm business plan must be developed.*

7 C.F.R. § 1924.56(b)(3) (emphasis added).

**26.** The Court notes that the Coopers argue that allowing the FmHA to consider changed circumstances following an appeal by an applicant results in practical problems. (Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. at 13.) Specifically, they assert that if changed circumstances can be considered in a situation such as this, then

> there could never be closure on any NAD appeal nor could any successful NAD appellant ever be sure of receiving a benefit to which they had been determined eligible.... Rather, following any successful appeal by a participant, the [FmHA] could defeat the outcome of that appeal by simply demanding "new" and "updated" information, ... citing "changed circumstances."

(*Id.*) While the Court recognizes that the practice of considering changed circumstances when *implementing an appeal decision is capable* of being abused, the facts of this case tend to indicate that the FmHA considered the Coopers' changed circumstances because of a significant change in the Coopers' financial position, not to avoid "closure."

**27.** Because this Court concludes that the FmHA's decision to deny the Coopers' debt restructuring or a buyout was proper, this Court need not address the Secretary's arguments with respect to the FAIR Act.

1996 buyout offer. (A.R.003349.) However-er, despite this conclusion, the FmHA, by letter dated December 4, 1996, informed the Coopers that they would not be allowed to do so. (Pls.' Ex. 20.) Specifically, the FmHA wrote "that the [FmHA] position on this matter remains unchanged.... As Mr. Cooper will recall[,] [the October 16, 1996,] letter withdrew the [January 1996 buyout offer]...." (*Id.*) Based upon these facts, the Coopers' contend that the FmHA "has violated clear, non-discretionary mandates contained in the governing statutes and regulations." (Pls.' Br. in Supp. of Mot. for Partial Summ. J. at 15.) In response to this allegation, the Secretary essentially contends that the FmHA decided to ignore the November 1996 NAD ruling because it disagreed with its conclusion: "The [November 1996 NAD ruling] ... did contain a provision allowing a net recovery buy out ... of $112,078.69.... Based on its interpretations of the applicable law and its regulations, [the FmHA] determined that [the Coopers] were ineligible for the [buyout] of $112,078.69." (Def.'s Resp. to Pls.' Mot. for Summ. J. at 6.) Although this Court does not necessarily agree with the Secretary's deliberate decision to ignore the November 1996 NAD ruling, the Court nonetheless finds that the FmHA's refusal to implement the appeal determination was justified and neither arbitrary, capricious, an abuse of discretion, nor or contrary to law because the November 1996 NAD ruling made no mention of the September 1996 hurricane incident, despite the fact that the corresponding hearing was held on October 17, 1996, more than one month *after* the Coopers' farm was destroyed. In addition, the November 1996 NAD ruling makes no reference to the FmHA's purported withdrawal of the January 1996 buyout offer. The record tends to indicate that the FmHA attempted to present the withdrawal letter, dated October 16, 1996, before and/or during the October 17, 1996, hearing upon which the November 1996 NAD ruling was based. Based upon these facts, it is apparent that the November 1996 NAD ruling failed to

consider the effects, if any, the destruction of the Coopers' farm property or the purported withdrawal of the January 1996 buyout offer had on the Coopers' case. As a result, the FmHA decision not to follow the November 1996 NAD ruling had some basis in fact and was neither arbitrary, capricious, an abuse of discretion, nor or contrary to law.

It is significant to note that the subsequent appeal determination—the June 1997 NAD ruling—noted that the Coopers' operations "changed significantly" when their poultry houses and attachments were destroyed. (Pls.' Ex. 25 at 2.) The NAD also found that the FmHA's efforts to withdraw the January 1996 buyout offer were effective. (*Id.* at 1.) The June 1997 NAD ruling was the only appeal determination issued by the NAD in this case which considered the effect, if any, the destruction of the Coopers' farm property had on their debt restructuring efforts. By allowing the FmHA to consider this changed circumstance, the NAD effectively reversed the November 1996 NAD ruling which declared the January 1996 buyout offer valid for ninety (90) days. The FmHA was therefore justified in failing to implement the buyout order issued by the NAD. Therefore, the Secretary's Motion for Summary Judgment with respect to the Cooper's claim that FmHA refused to implement a NAD decision is granted and the claim is dismissed with prejudice. Accordingly, the Coopers' Motion for Partial Summary Judgment filed with respect to this claim is denied.

C. *The FmHA's Alleged Violation of FmHA Procedures*

The Coopers further allege that the FmHA, during the course of its dealings with the Coopers, violated procedures set forth by the controlling statutes. For example, the debt restructuring statute requires, among other things, that "[w]ithin 90 days after receipt of a written request for restructuring from the borrower, the Secretary *shall* ... notify the borrow-

er in writing of the results of such calculations...." 7 U.S.C. § 2001(c)(4)(B) (emphasis added). However, as indicated previously, the Coopers requested restructuring in writing on August 8, 1994, but did not receive written notification of the results of their request until January 2, 1996, more than one year after the ninety-day period had run. Based on this and other failures to comply with similar statutes, the Coopers contend that "[t]he Secretary's conduct must be declared void and [be] set aside by the [C]ourt...." However, despite the FmHA shortcomings in following the mandates of the applicable statutes, this Court concludes that the Coopers are not entitled to relief.

In response to a similar argument, that the FmHA failed to follow statutory procedures, the Eighth Circuit in *Kinion v. United States*, 8 F.3d 639 (8th Cir.1993), discussed earlier, held that the FmHA's failure to comply with 7 U.S.C.2001(c)(4) did not divest the FmHA of its jurisdiction to act:

[T]he Supreme Court [has] stated: "We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake." Applying this standard, courts of appeals have refused to divest agencies of jurisdiction for failure to act within a mandatory time frame.

The statutory scheme adopted by Congress does not specify any consequences to the FmHA for non-compliance with the statutory time period. In addition, § 2001(a) requires that "[t]he Secretary shall modify delinquent farmer program loans ... to the maximum extent possible (1) to avoid loss to the Secretary ...; and (2) to ensure that borrowers are able to continue farming or ranching operations." Removing jurisdiction from the FmHA if it fails to act within sixty days furthers neither of these ob-

jectives and endangers the public's interest in minimizing financial loss to the government. We are reluctant to curb the FmHA's substantive authority in light of the Supreme Court's precedent "declining to restrict agencies' powers when Congress has not indicated any intent to do so."

*Id.* at 644 (citations omitted);[28] *see also Passarell v. Glickman,* 1997 WL 118407, *3 (D.D.C. Mar.6, 1997) (ruling that farmers were not entitled to receive benefits despite the fact that the Director of the NAD failed to complete a review of a NAD decision and issue a final determination within 30 days after receipt of review request, as required by statute).

This Court finds the Eighth Circuit's reasoning above persuasive to the extent that it prevents applicants from receiving a windfall as a result of failures on the part of an agency to comply with statutory time limits. As a result, the Secretary's Motion for Summary Judgment with respect to the Coopers' claim for failure to follow FmHA procedures is granted and the claim is dismissed with prejudice. Accordingly, the Coopers' Motion for Partial Summary Judgment filed with respect to this claim is denied.

### D. *Alleged Violation of the Coopers' Due Process Rights*

■ The Coopers' final allegation is that "[t]he Secretary's actions complained of in this action violated the Coopers' rights to Due Process of Law under the Fifth Amendment to the United States Constitution." (Compl.¶ 130.)[29] However, "'[t]he fundamental requisite of due process of law is the opportunity to be heard.'" *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287, 299 (1970) (quoting *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363, 1369 (1914)) (alteration added). In this

---

**28.** As noted previously, at the time the Kinions applied for restructuring the 7 U.S.C. § 2001(c)(4) window was sixty (60) days.

**29.** The Court notes that neither party directly addresses this cause of action in its summary judgment briefs.

case, the Coopers have had three NAD hearings. They have not shown that these hearings were in any way constitutionally insufficient. Accordingly, their due process claim must be dismissed. *See Passarell v. Glickman,* 1997 WL 118407, *3 (D.D.C. Mar.6, 1997) (due process claim dismissed where plaintiffs had four NAD hearings and failed to show that such hearings were unconstitutional). As a result, the Secretary's Motion for Summary Judgment with respect to the Coopers' claim for due process is granted and the claim is dismissed with prejudice. Accordingly, the Coopers' Motion for Partial Summary Judgment filed with respect to this claim is denied.

## VII. CONCLUSION

With respect to the FmHA's refusal to implement the November 1996 NAD ruling and the FmHA's violation of procedures set forth by the controlling statutes, it is not the intention of this Court to condone the FmHA's failure to effectively communicate with the Coopers and to timely process their application. Such inadequacies on the part of the FmHA do not support a ruling in favor of the Coopers on the substantive issues raised herein. Therefore, for the foregoing reasons, this Court concludes that the Coopers' Motion for Partial Summary Judgment is hereby denied.

This Court further concludes that the Secretary's Motion to Strike and Motion for Summary Judgment are granted. Accordingly, the Coopers' claims are hereby dismissed with prejudice.

An Order in accordance with this Memorandum Opinion shall be filed contemporaneously herewith.