**FIRST AMERICAN DISCOUNT CORPORATION,**
Petitioner,

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

No. 99–1098.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 19, 2000.

Decided Aug. 18, 2000.

**1010**

Patrick G. King argued the cause and was on the briefs for petitioner.

C. Maria D. Godel, Attorney, Commodity Futures Trading Commission, argued the cause for respondent. With her on the brief were David R. Merrill and J. Douglas Richards, Deputy General Counsel.

John J. Muldoon, III was on the brief for amicus curiae FCM Coalition for Regulatory Fairness.

Before: HENDERSON, RANDOLPH, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

Separate statement concurring in the judgment filed by Circuit Judge RANDOLPH.

GARLAND, Circuit Judge:

First American Discount Corporation seeks review of an order of the Commodity Futures Trading Commission (CFTC) holding the company jointly and severally liable for the acts of a commodities broker whose liabilities First American had agreed to guarantee. First American contends that the CFTC regulation pursuant to which it entered into the guarantee agreement is substantively and procedurally invalid, and further argues that the broker's customer waived the benefits of the guarantee. The CFTC rejected these claims, as do we.

**I**

First American is regulated under the Commodity Exchange Act (CEA) as a "futures commission merchant" (FCM). *See* 7 U.S.C. § 1a(12).[1] An FCM is the commodity market's equivalent of a securities brokerage house, soliciting and accepting orders for futures contracts and accepting funds or extending credit in connection therewith. *See* TIMOTHY J. SNIDER, REGULATION OF THE COMMODITIES FUTURES AND OPTIONS MARKETS § 6.04 (2d. ed.1997). Prior to 1982, FCMs did business with the public both through their own employees, known as "associated persons," and through loosely affiliated "agents." S.REP. No. 97-384, at 40 (1982). The main function of many such agents was to procure business for FCMs. *See id.* at 111. These agents were largely unregistered and unregulated. *See id.* at 40.

In 1982, the CFTC advised Congress that the number of agents was growing significantly, and that FCMs who used them "have often disavowed any responsibility for violations of the Act by these 'agents.'" *Id.* The Commission proposed that "each 'agent' of a futures commission merchant be required to register as an associated person of that futures commission merchant." *Id.* Congress, however, did not adopt the CFTC's recommendation. As the Senate Committee on Agriculture, Nutrition, and Forestry explained:

[T]he Committee felt it would be inappropriate to (1) require these independent business entities to become branch offices of the futures commission merchants through which their trades are cleared or (2) to impose vicarious liability on a futures commission merchant for the actions of an independent entity.

---

1. The CEA defines an FCM as:

an individual, association, partnership, corporation, or trust that—(A) is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market; and (B) in or in con-

nection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(12).

*Id.* at 41. At the same time, Congress acknowledged the need "to guarantee accountability and responsible conduct of such persons," *id.,* who "deal with commodity customers and, thus, have the opportunity to engage in abusive sales practices," *id.* at 111.

To resolve this dilemma, Congress drafted legislation requiring all persons who solicit or accept customer orders for FCMs to register with the CFTC, but permitting them to register either as "associated persons" of the FCMs, or as part of a new class of registrants called "introducing brokers." *Id.* at 112. The latter were conceived of as independent entities that solicited and accepted customer orders but used the services of FCMs for clearing, record keeping and retaining customer funds. *See id.* at 41. To guarantee the accountability of introducing brokers, the Commission was authorized to require them to meet "minimum financial requirements." *See id.*

The new provisions were enacted as part of the Futures Trading Act of 1982, Pub.L. No. 97–444, 96 Stat. 2294, which amended the CEA. Most significant for our purposes are amended CEA section 1a, 7 U.S.C. § 1a, which creates the category of "introducing brokers,"[2] and amended section 4f(b), 7 U.S.C. § 6f(b), which directs the CFTC to ensure that every introducing broker "meets such minimum financial requirements as the Commission may by regulation prescribe as necessary to insure his meeting his obligations as a registrant."[3] In adopting the latter, the House Conference Report stated:

> [T]he conferees contemplate that the Commission will establish financial requirements which will enable [introduc-

ing brokers] to remain economically viable, although it is intended that fitness tests comparable to those required of associated persons will also be employed. The intent of the conferees is to require Commission registration of all persons dealing with the public, but to provide registrants with substantial flexibility as to the manner and classification of registration.

H.R. CONF. REP. No. 97–964, at 41 (1982).

In April 1983, the CFTC responded to Congress' mandate by publishing a notice of proposed rulemaking setting forth a $25,000 "minimum adjusted net capital requirement" for introducing brokers. 48 Fed.Reg. 14,933, 14,942 (1983) (proposed rule). In addition, those brokers whose capital reserve decreased to less than an "early warning level" of 150% of that amount would, under the proposed rule, be required to notify the CFTC and file monthly financial statements. *Id.* at 14,-951. The capital requirement, therefore, would effectively have been $37,500. *See* 48 Fed.Reg. 35,248, 35,262 (1983) (final rule). The CFTC stated that requiring introducing brokers to have such a permanent capital base "not only would establish a benchmark of economic viability, but would also be an important element of customer protection." 48 Fed.Reg. at 14,-942. The proposed minimum would "provid[e] coverage for potential liabilities arising from business operations, customer relations and the handling of proprietary accounts." *Id.*

After publication of the notice, the CFTC received numerous comments, including many from the industry contending that the proposed capital requirements

---

**2.** The statute defines an introducing broker as:

> any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant) engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market who does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guar-

antee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(14).

**3.** The amended statute bars registration of an introducing broker unless the broker meets the CFTC's minimum financial requirements, *see* 7 U.S.C. § 6f(b), and makes it unlawful to engage in business as an introducing broker unless registered as such, *see* 7 U.S.C. § 6d.

were excessive. The CFTC issued its final rule on August 3, 1983. The final rule took the industry's comments into account by reducing the minimum net capital requirement to $20,000 and entirely eliminating the proposed early warning requirement for introducing brokers. *See* 48 Fed. Reg. at 35,249. In addition, adopting the suggestion of several FCMs, the Commission announced an alternative method for complying with the financial requirement. Under this alternative, an introducing broker may satisfy the requirement without maintaining any net capital of its own, if it enters into a guarantee agreement with an FCM under which the FCM agrees to:

> guarantee[ ] performance by the introducing broker of, and ... be jointly and severally liable for, all obligations of the introducing broker under the Commodity Exchange Act ... with respect to the solicitation of and transactions involving all commodity customer ... accounts of the introducing broker entered into on or after the effective date of [the] agreement.

CFTC Form 1–FR–IB (Part B); *see* 17 C.F.R. § 1.3(nn); 48 Fed.Reg. at 35,249.[4] The rule became effective on August 3, 1983.[5]

Taking advantage of the alternative compliance mechanism contained in the final rule, First American entered into a guarantee agreement with Wolf Futures Group, Inc., an introducing broker. Pursuant to the new regulations, the agreement stated that First American would be jointly and severally liable for all of Wolf's obligations as an introducing broker under the CEA. *See Violette v. First Am. Discount Corp.*, CFTC Doc. No. 97–R020, 1999 WL 92428, at *3 n. 1 (Feb. 24, 1999). Wolf Futures subsequently introduced Gregory Violette to First American to open a commodity futures trading account in Violette's name.

On December 11, 1996, Violette filed a complaint with the CFTC against Wolf Futures and its principal, Scott Allen Wolf [hereinafter referred to collectively as "Wolf"]. On August 31, 1998, a CFTC Judgment Officer found that Wolf had traded Violette's account without written authorization in violation of CFTC Regulation 166.2, 17 C.F.R. § 166.2. *See Violette v. First Am. Discount Corp.*, CFTC Doc. No.97–R020, 1998 WL 552810 (Aug. 31, 1998). The Officer assessed damages of $13,438.50, plus prejudgment interest and costs. Most significant for our purposes, the Officer held First American jointly and severally "liable for the acts of Wolf by virtue of its status as guarantor." *Id.* at *23.

First American appealed to the Commission, raising three arguments: (1) that the CFTC regulation providing for guarantor status was contrary to congressional intent and thus invalid; (2) that the regulation was void for lack of proper notice under the Administrative Procedure Act (APA); and (3) that an exculpatory clause in a contract Violette signed with First American overrode the guarantee agreement. The Commission ruled against First American on all three claims and affirmed the decision of the Judgment Officer. *See Violette*, 1999 WL 92428, at *1. Pursuant to 7 U.S.C. § 18(e), First American petitions this court for review of the Commission's order.

## II

■ First American's initial claim is that the CFTC's final rule, which sets forth minimum capital requirements and permits the alternative of a guarantee agreement, contravenes the 1982 Act. Our analysis of an agency's interpretation of a statute is guided by the two-step framework of *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We first ask "whether Congress has directly spoken to the

---

4. Introducing Brokers who register under this option are known as "Guaranteed Introducing Brokers." *See* 48 Fed.Reg. at 35,260.

5. In 1996, citing inflation, the CFTC raised the floor from $20,000 to $30,000. *See* 61 Fed.Reg. 19,177, 19,183 n.31 (1996).

precise question at issue," in which case we "must give effect to the unambiguously expressed intent of Congress." *Id.* If the "statute is silent or ambiguous with respect to the specific issue," however, we move to the second step and must defer to the agency's interpretation as long as it is "based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

■ First American raises only a *Chevron* step one argument, contending that the guarantee provision is "contrary to the express intent of Congress." First American Br. at 7. We can perceive no such express intent. The 1982 Act authorizes the CFTC to issue regulations prescribing "minimum financial requirements" to ensure that an introducing broker meets "his obligations as a registrant." 7 U.S.C. § 6f(b). The statute is silent as to what such a financial requirement might be, and certainly does not say that the CFTC may not use an FCM's guarantee in satisfaction of that requirement. Instead, "Congress has explicitly left a gap for the agency to fill" and has made "an express delegation of authority to the agency to elucidate [the] specific provision of the statute by regulation." *Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778. We therefore proceed to *Chevron's* step two.

Although First American does not address the second step of *Chevron,* the CFTC does and we find its analysis compelling. The question is whether the combination of a net capital requirement, supplemented with the alternative of a guarantee, reasonably falls within the undefined term, "minimum financial requirements." The CFTC responds that the statute authorizes it to impose such requirements to insure that an introducing broker can meet "his obligations as a registrant," and the Commission reasonably explains that the guarantee alternative is, like the capital requirement, a way of: "(1) Insuring that introducing brokers are not judgment proof; and (2) providing coverage for potential liabilities of introducing brokers arising from business op-

erations and customer relations." 48 Fed. Reg. at 35,264.

Recognizing the absence of support for its position in the statutory language, First American asks us to retrace our *Chevron* steps and reconsider step one by looking at the legislative history of the 1982 Act. That history, appellant contends, expressly bars the guarantee provision at issue here. In support, First American cites the passage in the Senate Report stating that the Committee felt it would be inappropriate "to require" introducing brokers to become branch offices of FCMs, or "to impose" vicarious liability on FCMs for acts of introducing brokers. S.REP. No. 97–384, at 41. First American contends that the guarantee provision is inconsistent with this congressional concern, arguing that it effectively requires an introducing broker to become a branch office of its affiliated FCM, and effectively imposes vicarious liability on an FCM for the conduct of its affiliated introducing broker.

The flaw in this argument is that the guarantee provision does not "require" or "impose" anything: it is merely an option that either the introducing broker or the FCM is free to reject. Rather than seek out an FCM for a guarantee, an introducing broker may instead choose to satisfy the capital requirement itself. And an FCM asked by an introducing broker for a guarantee may simply decline, electing instead to use its own employees or to work with introducing brokers that can independently satisfy the capital requirement. Accordingly, under the CFTC's regulation, the FCM's acceptance of liability through the guarantee is a voluntary choice, which nothing in the legislative history precludes the CFTC from making available.

But, First American protests, the guarantee provision is not truly an option. In petitioner's view, the CFTC's $20,000 minimum capital requirement is so high that introducing brokers are effectively "forced" to sign guarantee agreements. It is this reality that assertedly contravenes both the Senate Committee's distaste for

imposing obligations upon FCMs, and the Conference Report's contemplation "that the Commission will establish financial requirements which will enable [introducing brokers] to remain economically viable." H.R. Conf. Rep. No. 97–964, at 41.

We see nothing in the statute or legislative history, however, that would foreclose a $20,000 minimum capital requirement as "too high." Both are silent on the question of what the "minimum" in "minimum financial requirements" means. Moving again to *Chevron*'s step two, we also see no ground upon which the CFTC's standard could be viewed as an impermissible interpretation of that term, or even of the conferees' phrase, "economically viable." The CFTC originally proposed an effective requirement of $37,500, cutting it almost in half to $20,000 after considering industry comments. First American has offered no evidence whatsoever to substantiate its claim that a $20,000 requirement is still too high to allow introducing brokers to remain economically viable, or that it is so high as to force them to opt for an FCM guarantee.[6]

Moreover, although it is true that the legislative history reflects congressional concern that the economic viability of introducing brokers be maintained, it also reflects Congress' intent—as the statute itself says—that the financial requirements be set at a level that will ensure that an introducing broker meets "his obligations as a registrant." 7 U.S.C. § 6f(b). The Commission was instructed to impose standards sufficient "to guarantee accountability and responsible conduct," S.Rep. No. 97–384, at 41, and to ensure "that persons handling orders for commodity trades cannot escape responsibility for their actions for lack of adequate capital," *id.* at 112. Implementing this congressional intent was precisely the rationale the CFTC of-

fered for finally settling upon a minimum requirement of $20,000. *See* 48 Fed.Reg. at 35,261, 35,264. And First American offers no basis for concluding that such a requirement is too high to be reasonably related to the goal of ensuring that customers' claims are not rendered moot because introducing brokers are judgment proof. If anything, the more than $13,000 in damages awarded in the relatively small case now before us suggests that the facts are to the contrary.

In sum, we conclude that the $20,000 minimum capital requirement for introductory brokers is a permissible exercise of the CFTC's regulatory authority, and that it is equally permissible for the Commission to provide the alternative of entering into a guarantee agreement with an FCM. Indeed, providing such an option is faithful to Congress' direction that the CFTC "provide the registrants with substantial flexibility as to the manner and classification of registration." H.R. Conf. Rep. No. 97–964, at 41.

### III

█ First American's second challenge to the CFTC's rule is procedural. Petitioner contends that the guarantee option should be invalidated because it was not subject to notice and comment prior to final issuance. As we have discussed, the notice of proposed rulemaking issued by the CFTC on April 6, 1983, stated that the Commission was contemplating a $25,000 capital requirement, which, when combined with the proposed "early warning" requirement, would effectively require a minimum capital level of $37,500. The possibility of a guarantee option, later offered in the final rule, was not mentioned. Petitioner contends that this failure to publish notice of the guarantee option violated the APA,

---

**6.** The CFTC acknowledged that the SEC had established a lower minimum net capital requirement ($5,000) for securities introducing brokers. It explained, however, that a securities introducing broker is required to maintain the *higher* of $5,000 or 6⅔% of aggregate indebtedness, "which could require such a

firm to maintain more than $25,000 of net capital." 48 Fed.Reg. at 14,934 n.13. The CFTC also noted that its higher base amount was necessary "because introducing brokers in commodities will have fewer restrictions on their activities than is the case for securities introducing brokers." *Id.* at 14,942–43.

which generally requires an agency to give at least thirty days notice of and an opportunity to comment on "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b); *see id.* § 553(c), (d).

■ The law does not require that every alteration in a proposed rule be reissued for notice and comment. If that were the case, an agency could "learn from the comments on its proposals only at the peril of" subjecting itself to rulemaking without end. *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 632 & n. 51 (D.C.Cir.1973); *see Fertilizer Institute v. EPA,* 935 F.2d 1303, 1311 (D.C.Cir.1991); *American Medical Ass'n v. United States,* 887 F.2d 760, 768 & n. 7 (7th Cir.1989). Instead, renewed notice is required only if the final rule cannot fairly be viewed as a "logical outgrowth" of the initial proposal. *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 547 (D.C.Cir. 1983). The test for a "logical outgrowth," variously phrased, is whether a reasonable commenter "should have anticipated that such a requirement" would be promulgated, *id.* at 549, or whether the notice was "sufficient to advise interested parties that comments directed to the" controverted aspect of the final rule should have been made, *Fertilizer Institute,* 935 F.2d at 1312.

In this case, the outcome of that test is a relatively close question. As we have said above, the guarantee agreement is reasonably regarded as a form of minimum financial requirement, and was promulgated in response to suggestions that it be offered as an alternative to the $25,000 capital requirement originally proposed. The fact that others in First American's shoes— that is, other FCM's—did comment on and indeed propose the guarantee option suggests that they, at least, regarded it as a logical outgrowth. *See* Comments of Abramson & Fox at 6 (proposal by law firm "retained by several major futures commission merchants" that "the carrying FCM be permitted to assume full regulato-

ry and financial responsibility for the activities of the introducing broker"); Comments of Heinold Commodities, Inc. at 2 (proposal by registered FCM that, as an alternative to a capital requirement, the carrying FCM should be permitted to "stand as a guarantor for the introducing broker's potential liabilities"); Comments of Cargill Investor Services, Inc. at 1 (suggesting that as long as "the FCM remains fully responsible to the customer, there is no reason for [introducing brokers] to fulfill a capital requirement" ). On the other hand, it could well be argued that a reasonable commenter would not have thought to comment on a guarantee option since it is different not only in degree but in kind from a financial requirement denominated in dollars. Under that view, the connection between the original notice and the guarantee option would be "simply too tenuous" for the latter to be regarded as a "logical outgrowth" of the former. *Small Refiner,* 705 F.2d at 549.

We need not resolve this question, however, because CFTC's failure to re-notice the guarantee option was at best harmless. The APA directs reviewing courts to take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706. "As incorporated into the APA, the harmless error rule requires the party asserting error to demonstrate prejudice from the error." *Air Canada v. DOT,* 148 F.3d 1142, 1156 (D.C.Cir.1998) (citing 5 U.S.C. § 706); *see Steel Mfrs. Ass'n v. EPA,* 27 F.3d 642, 649 (D.C.Cir.1994) (acknowledging agency's failure to provide opportunity for comment on one portion of a rule, but upholding the rule under APA's "harmless error" provision); *Cabais v. Egger,* 690 F.2d 234, 237 n. 4 (D.C.Cir.1982) ("Even where notice and comment were erroneously omitted, a regulation or rule need not be invalidated if it has no substantial impact."). Assuming that the notice provided by the CFTC was insufficient, we conclude that First American suffered no prejudice as a result.

As we have discussed above, the portion of the rule to which First American objects

is merely an alternative to the primary compliance requirement of maintaining $20,000 in net capital. That primary requirement is perfectly lawful, and one upon which First American did have an opportunity to comment. First American was not required to accept the guarantee alternative; it was free to turn Wolf away and instead to use its own employees or to deal only with introducing brokers who could meet the capital requirement. That First American did not do so evidences its view either that the guarantee was not harmful, or that it was less harmful than the primary requirement by which it would otherwise have had to abide. The lack of opportunity to comment on the guarantee option therefore cannot be cause for overturning the CFTC's regulation.

We also note that the concept of a guarantee option came from FCMs looking for a way to give both their introducing brokers and themselves an alternative to the minimum capital requirement. This indicates that FCMs regarded the guarantee as an alternative that was beneficial rather than harmful to their interests. Although First American is not bound by the views of its fellow FCMs, its own voluntary decision to adopt the guarantee option makes clear that it regarded it the same way. This reinforces the conclusion that the CFTC's failure to extend the rulemaking to provide an opportunity for notice and comment on the guarantee option was at best harmless error.

■ Finally, the fact that First American not only was not harmed by, but rather affirmatively benefitted from, the availability of the guarantee option suggests a second reason for not countenancing its claim of procedural error. Under the doctrine of equitable estoppel, "a party with full knowledge of the facts, which accepts the benefits of a transaction, contract, statute, regulation, or order may not subsequently take an inconsistent position to avoid the corresponding obligations or effects." *Kaneb Servs., Inc. v. FSLIC,* 650 F.2d 78, 81 (5th Cir.1981). Here, the CFTC gave First American the option of

guaranteeing the liabilities of Wolf, an introducing broker who could not otherwise have operated for lack of sufficient capital. First American had no obligation to make the guarantee, but did so in exchange for the financial benefits both entities expected to reap from their joint arrangement. Having received those benefits, First American will not now be heard to attack the regulation that was their source. *See Federal Power Comm'n v. Colorado Interstate Gas Co.,* 348 U.S. 492, 502, 75 S.Ct. 467, 99 L.Ed. 583 (1955) ("[Respondent] cannot now be allowed to attack an officially approved condition of the merger while retaining at the same time all of its benefits.").

## IV

First American's final challenge to the order holding it liable for the conduct of its introducing broker is based on an exculpatory clause included in an agreement that Violette signed with First American after Wolf introduced the two. Paragraph 23 of the two-page, standard-form "Customer Agreement" reads as follows: "Customer hereby waives any claim based upon First American's guarantee, if any, of Introducing Broker's obligations under the Commodity Exchange Act or CFTC regulations." J.A. at 27. First American argues that this provision immunizes it from liability that would otherwise attach under the guarantee agreement it signed with its introducing broker.

■ The CFTC disagrees. It states that its Regulation 1.10(j), 17 C.F.R. § 1.10(j), which permits an introducing broker to satisfy its capital requirements through an FCM guarantee, cannot be waived in this manner. Whether or not an agency's regulation is waivable is a question of the agency's intent, and just as we must defer to the agency's reasonable interpretation of the statutory scheme it was entrusted to administer, so too must we give its interpretation of its own regulation "controlling weight unless it is plainly er-

roneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *see Christensen v. Harris County*, 529 U.S. 576, ——, 120 S.Ct. 1655, 1663, 146 L.Ed.2d 621 (2000); *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).

■ The CFTC's interpretation of its regulation as non-waivable is neither plainly erroneous nor inconsistent with the regulation. Nothing in the text of the rule suggests that the guarantee is waivable. To the contrary, the mandatory form agreement required by the rule states: "This guarantee agreement is binding and is and shall remain in full force and effect unless terminated in accordance with the rules, regulations or orders promulgated by the Commission with respect to such terminations." CFTC Form 1–FR–IB (Part B); *see* 17 C.F.R. § 1.3(nn) (requiring guarantee to conform to Form 1–FR).[7] Under the regulations, termination is permitted (with prospective effect only) by mutual written consent of the parties with prompt notice to the Commission, or by either party with written notice to the other and to the Commission. *See* 17 C.F.R. § 1.10(j)(5)(iii). The rules do not permit termination by waiver of a customer, and First American does not argue that the events which do permit termination occurred in this case.

Moreover, the CFTC contends that permitting customer waiver would "undermine[ ] the protections provided by the guarantee agreement." *Violette*, 1999 WL 92428, at *2. The purpose of the Commission's rule is to provide coverage for the liabilities of introducing brokers and to ensure that they are not "judgment proof." 48 Fed.Reg. at 35,264. The CFTC reason-

ably argues that if the guarantee were waivable—particularly through the kind of boilerplate contract at issue here—that purpose would be wholly defeated. *See Gray v. American Express Co.*, 743 F.2d 10, 16 (D.C.Cir.1984) (declining to give effect to provision in cardmember contract that would have effectively waived coverage of Fair Credit Billing Act); *id.* at 16 ("The rationale of consumer protection legislation is to even out the inequalities that consumers normally bring to the bargain. To allow such protection to be waived by boiler plate language of the contract puts the legislative process to a foolish and unproductive task.").

Finally, and perhaps most telling, even if we were to hold a guarantee agreement waivable by a customer, not even First American contends that the CFTC's minimum capital requirement would itself be waivable in that manner. *See* 7 U.S.C. § 6f(b) (providing that each registered introducing broker "shall at all times continue to meet" the minimum financial requirements prescribed by the Commission). Yet, to hold the one is to hold the other. As the rules make clear, a guarantee agreement is entered into "in satisfaction of the adjusted net capital requirements with which the introducing broker otherwise would have to comply," and thus permits the introducing broker to operate below the minimum level of required net capital. CFTC Form 1–FR–IB (Part B); *see* 17 C.F.R. § 1.3(nn). Although First American argues that the guarantee may be waived, it does not suggest that the CFTC may thereafter deregister the introducing broker if it cannot muster $20,000 in capital. But if the Commission cannot deregister such a broker, permitting waiver would effectively permit the broker to slip the bonds of the capital requirement

---

7. *See also* 48 Fed.Reg. at 35,265 ("If the guarantee agreement does not expire or is not terminated in accordance with the provisions of § 1.10(j)(4) or (5), it shall remain in effect indefinitely."). Guarantee agreements can

expire (with prospective effect only) if the FCM or introducing broker fails to renew its registration of if such registration is suspended, revoked, or withdrawn. *See* 17 C.F.R. § 1.10(j)(4)(i)-(ii).

**1018**

altogether. The CFTC reasonably interprets its regulations as not countenancing such blatant circumvention of their purpose.

First American complains that even if the CFTC's nowaiver interpretation is correct, allowing the Commission to apply it for the first time in this adjudication would be unfair.[8] We do not agree. There is nothing in the language of the regulation to suggest to a reasonable FCM that guarantees are waivable, and the termination provision suggests quite the opposite. Court decisions dating back to at least 1991, five years before Violette signed the waiver at issue here, hold that waiver agreements purporting to invalidate identical guarantee agreements are unenforceable as contrary to the purpose of the statutory and regulatory framework. *See, e.g., Skipper v. Index Futures Group Inc.*, No. 91C1624, 1995 WL 493435 (N.D.Ill.1995); *Resolution Trust Corp. v. Krantz*, No. 89C166, 1991 WL 148291 (N.D.Ill.1991).[9] Moreover, even if it were unfair for the CFTC only now to make clear that the regulatory requirement cannot be waived, it would be at least as unfair to Violette to announce the opposite rule. Indeed, we cannot help but note the irony in petitioner's claim that Violette—a retired postal worker—"voluntarily" entered into the boilerplate waiver agreement with First American, while First American itself—a large brokerage firm—was simultaneously "compelled" to enter into the guarantee agreement with Wolf.[10]

## V

We uphold the validity of the regulation permitting guarantee agreements as alternatives to minimum capital requirements, and further uphold the CFTC's interpretation of that regulation as not permitting customer waivers. Accordingly, we have no ground for reversing the Commission's order holding First American jointly and severally liable for the regulatory violations committed by its introducing broker. The petition for review is denied.

RANDOLPH, Circuit Judge, concurring:

I concur in the judgment and in all of the court's opinion except the portion of Part III holding that the Commission's failure to give notice amounted to harmless error.

---

**8.** This is actually the second case in which the CFTC has so ruled. The CFTC issued its first opinion on the subject a month earlier. *See Clemons v. McCabe*, CFTC Doc. No. 97–R053, 1999 WL 46833, at *2 (Jan. 29, 1999).

**9.** First American cites two cases in which it contends courts upheld exculpatory waiver provisions in contracts between FCMs and customers. *See Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 250–51 (7th Cir. 1987); *Cange v. Stotler and Co.*, 826 F.2d 581 (7th Cir.1987); *id.* at 596 (Easterbrook, J., concurring). In neither case, however, was there a guarantee agreement between an FCM and an introducing broker, and hence in neither was the waivability of the CFTC's reg-

ulation at issue. *See Cange*, 826 F.2d at 596 (Easterbrook, J., concurring) (arguing that waivers should generally be upheld "[u]nless ... the CFTC forbids them by regulation"). Moreover, in *Cange* the majority opinion suggested that an exculpatory waiver provision signed prior to the initiation of trading *would not* be enforceable. *See* 826 F.2d at 594–95.

**10.** We also note that First American has an indemnification agreement with Wolf that will permit it to recover from the introducing broker in the event it is held liable for the latter's wrongdoing. *See* Letter from Counsel for First American (Jan. 20, 2000). CFTC regulations authorize such indemnification agreements. *See* 48 Fed.Reg. at 35,264.