**Joseph CERNIGLIA Plaintiff,**

v.

**Daniel R. GLICKMAN, Secretary, United States Department of Agriculture Defendant.**

**No. 99–1634 (RCL).**

United States District Court, District of Columbia.

Oct. 11, 2000.

Alan Charles Raul, Sidley & Austin, Washington, DC, for Plaintiff.

Claire M. Whitaker, U.S. Attorney's Office, Washington, DC, for Defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

The plaintiff has a farm that is partially financed by loans from the Farm Services Agency ("FSA"), a unit within the United States Department of Agriculture. Fall-

ing behind on his loan payments, the plaintiff applied for loan servicing—a way for delinquent borrowers to renegotiate their obligations to the government. After a lengthy application process, the plaintiff was eventually denied loan servicing. This denial was appealed twice, and is now appealed a third time in this Court.

Now before the Court are cross motions for summary judgment. Although the motions present a variety of issues, the Court need only consider two: (1) whether the defendant's interpretation of "eligibility" under 7 C.F.R. § 1951.909 is acceptable, and (2) whether the defendant's delay, if any, in processing the plaintiff's loan servicing application violated applicable law.

The Court finds for the defendant on both issues. Accordingly, the Court GRANTS the defendant's motion for summary judgment on those issues and DENIES the plaintiff's motion for summary judgment on those issues. The remaining issues, being rendered moot by the eligibility decision, are thus DISMISSED WITHOUT PREJUDICE.

## BACKGROUND

### I. The Statutory and Regulatory Scheme

In 1994, Congress created the FSA. One of the FSA's duties is the administration of the Farm Loan Programs, formerly handled by the Farmer's Home Administration. Under this program, the FSA makes loans to farmers for operating expenses and land purchases. These loans are normally secured by the farmer's real and personal property.

To assist farmers who fall behind in their loan payments, Congress also created the Primary Loan Servicing Program. *See* 7 U.S.C. § 2001 et seq. (1994). This program allows delinquent loans to be "serviced" by consolidation and rescheduling, reamortization, deferral, debt set-

aside, and write-down. To qualify for primary loan servicing, four factors must be satisfied: (1) the borrower's delinquency must be "due to circumstances beyond the control of the borrower," (2) "the borrower must have acted in good faith with the Secretary [of Agriculture] in connection with the loan," (3) "the borrower must present a preliminary plan containing reasonable assumptions" that demonstrates an ability to meet all expenses under the restructured loan, and (4) the loan, if restructured, would yield a net recovery to the government equal to or exceeding what foreclosure would yield. 7 U.S.C. § 2001(b).

One of the loan servicing options, a loan write-down, can be accomplished through what is called a "conservation contract"—a contract between the Secretary of Agriculture and the farmer. Under the contract, the farmer grants an interest in his land to the government in exchange for a write-down of his debt.[1] A conservation contract is available if the farmer qualifies for primary loan servicing and four additional factors are met: (1) the contract property must be "wetland, upland, or highly erodible land", (2) the property must be "suitable" for the purposes involved, (3) the property must be loan security, and (4) the contract "better enables a qualified borrower to repay the loan." 7 U.S.C. § 349(c).

To assist in the administration of the loan servicing program, the Secretary of Agriculture has promulgated an extensive body of regulations. *See* 7 C.F.R. § 1951, subpart S. Of particular importance in this case are the Secretary's eligibility requirements that supplement the statutory requirements of 7 U.S.C. § 2001(b) listed above. Specifically, section 1951.909(c)(4) provides:

> Borrowers with sufficient nonessential assets[2] to bring the FLP [Farm Loan

---

1. The government usually exercises this interest by keeping the land fallow, thus "conserving" the land.

Programs] loan current are not eligible under [part 1951, subpart S].

7 C.F.R. § 1951.909(c)(4). Neither the statutory nor the regulatory provisions specify a particular point in the loan servicing process when a final decision on eligibility must be rendered.

## II. Factual and Procedural History

Joseph Cerniglia, the plaintiff, grows apples and grapes on his farm in Vermont. His farm is partially financed by loans from the FSA. In early 1995, being unable to make his loan payments, Mr. Cerniglia applied for primary loan servicing with the FSA. The FSA found him eligible for loan servicing in general, and a conservation contract in particular. Electing to service his loans with a conservation contract, the multi-stepped process of contract finalization was begun. Over a year later, the FSA, while still in the process of finalizing the contract, discovered through a local newspaper that Mr. Cerniglia had sold a portion of his winery to Stroh Brewery Company. The sale increased his nonessential assets to $2,084,284. At the time, only $167,615 was needed to bring his FSA loan current.

With this revelation, the FSA sought updated financial records from Mr. Cerniglia. After obtaining the necessary records, the FSA made a final decision on the conservation contract on January 27, 1998. The FSA decided that Mr. Cerniglia was not eligible for the conservation contract because he had sufficient nonessential assets to bring his accounts current.

Mr. Cerniglia appealed this decision to the National Appeals Division ("NAD") in the spring of 1998. He argued that he was found eligible for the contract in 1995 and that the regulations do not require continuous eligibility throughout the approval process. Further, he argued that, even if there were such a requirement, the FSA

unlawfully delayed the processing of his application, thereby causing the final consideration of his contract to fall after his sale to Stroh's Brewery.

After a series of proceedings, the NAD hearing officer ruled on November 4, 1998 that (1) the FSA had the authority to ask for current financial information after the applicant had submitted a complete application, (2) Mr. Cerniglia's financial situation and assets were a relevant factor in considering a request for a conservation contract, (3) although eligibility for a conservation contract is initially determined at the beginning of the review process, the borrower must remain eligible for such servicing until the final closing, and (4) no credible evidence existed to support Mr. Cerniglia's allegations of unlawful delays.

This decision resulted in another appeal, this time to the NAD Director. On March 18, 1999 the NAD Director ruled that (1) Mr. Cerniglia's request for a conservation contract was separate from his earlier successful request for primary loan servicing, (2) when a conservation contract is considered without other primary loan servicing, there is no regulatory deadline within which the FSA must make a decision, (3) the FSA properly considered Mr. Cerniglia's post–1997 financial information to determine eligibility, and (4) the FSA properly found Mr. Cerniglia ineligible for a conservation contract because he had nonessential assets well in excess of his past due debt.

The NAD Director's decision gave rise to the instant civil action. As mentioned at the outset, the Court need only address two of the plaintiff's claims: (1) the claim that the FSA violated 5 U.S.C. § 706(2) in conducting a second review of his eligibility, and (2) the claim that the FSA violated 5 U.S.C. § 706(2) by delaying the processing of his loan servicing application.

---

**2.** "Nonessential assets" are defined as assets that do not contribute to the payment of essential family living expenses and farm operating expenses and are not exempt under bankruptcy law. *See* 7 C.F.R. § 1951.906.

*ANALYSIS*

## I. Jurisdiction

 As a preliminary matter, this court has jurisdiction pursuant to 7 U.S.C. § 6999 (1994), which provides that "[a] final determination of the [National Appeals] Division shall be reviewable and enforceable by any 'United States district court of competent jurisdiction ....'" An FSA denial of loan servicing and NAD Director review are considered final agency actions, and reviewable under the APA. *See Deaf Smith County Grain Processors, Inc. v. Glickman*, 162 F.3d 1206, 1213 (D.C.Cir.1998).

## II. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir.1995). To survive a motion for summary judgment, the nonmovant must make a "sufficient showing to establish the existence of an element essential to that party's case." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265. A "sufficient showing" exists when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## III. The FSA's Eligibility Determination

The plaintiff argues that, as he had already been determined eligible for loan servicing in October 1995, the FSA had no authority to reverse that finding on January 27, 1998. The defendant argues that, under its interpretation of the eligibility regulations, an applicant for loan servicing must remain eligible for servicing throughout the entire application process. After a thorough consideration of the statutory and regulatory scheme, the Court finds the defendant's interpretation to be reasonable.

### A. *Seminole Rock* and an Agency's Interpretation of Its Own Regulations

 According to the most cited case in American legal history, a reviewing court must accept an agency's reasonable interpretation of an ambiguity in a statute the agency is charged with administering. *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). A less famous but still important case, *Bowles v. Seminole Rock & Sand Co.*, states a similar principle. 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). *Seminole Rock* dealt not with an agency's interpretation of a statute, but with an agency's interpretation of its own regulations. According to the Court, judicial construction of an ambiguous regulation should be guided by the "administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* at 414, 65 S.Ct. 1215.

The age of *Seminole Rock*, over half a century old, should not mislead one as to its vitality. The Supreme Court, as well as this Circuit, have affirmed its rule repeatedly, the most recent affirmances being in the past few months. *See Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 1663, 146 L.Ed.2d 621 (2000); *First American Discount Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1016 (D.C.Cir.2000). *See also Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *United States v. Larionoff*, 431 U.S. 864, 872–73, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Presbyterian Med. Ctr. of Univ. of Penn. Health Sys. v. Shalala*, 170 F.3d

1146, 1150 (D.C.Cir.1999); *U.S. v. Hubbell*, 167 F.3d 552, 554 (D.C.Cir.1999).

Under *Seminole Rock* deference, a reviewing court "need not find that [the agency's] construction is the only reasonable one, or even that it is the result [a court] would have reached had the question arisen in the first instance in judicial proceedings." *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). As well, the agency's interpretation "need not be the best or most natural one by grammatical or other standards." *Pauley v. BethEnergy Mines*, 501 U.S. 680, 702, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991). Rather, the interpretation need only be a "plausible construction," *Ehlert v. United States*, 402 U.S. 99, 105, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971), that "sensibly conforms to the [regulation's] purpose and wording." *Northern Ind. Pub. Serv. Co. v. Porter County Chapter of Izaak Walton League of Am., Inc.*, 423 U.S. 12, 15, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975).

**B. The FSA's Interpretation of Eligibility under 7 C.F.R. § 1951.909**

Viewing the FSA's interpretation of section 1951.909 under the deferential standard this Court is charged with applying, the Court concludes that the interpretation is not "plainly erroneous or inconsistent with the regulation." *Seminole Rock*, 325 U.S. at 414, 65 S.Ct. 1215.

One need not parse any text to understand that the FSA's loan servicing program seeks to help farmers in times of financial distress. Congress made that clear in the very beginning of the statute, directing the FSA to "modify delinquent farmer program loans" so as to ensure that farmers "are able to continue farming." 7 U.S.C. § 2001(a)(2). Such assistance however is not entirely altruistic. By giving up some of its returns, the government is able to minimize "losses to the Secretary on such loans." 7 U.S.C. § 2001(a)(1).

Most government assistance programs only distribute benefits to those who need them. The FSA's loan servicing program is no different. It excludes farmers with "sufficient nonessential assets to bring the . . . loan current." 7 C.F.R. § 1951.909(c)(4). Consistent with only helping those who need help, the program seeks to make loan servicing decisions based on the farmer's "current (within 90 days) financial statement."[3] 7 C.F.R. § 1951.907(e).

These few observations are enough to support a finding of reasonableness with regard to the FSA's interpretation. The nature of the program as well as the procedures followed suggest the sensibility of an ongoing eligibility requirement. An initial determination of eligibility ensures that the application process is not pursued in vain; and a final determination of eligibility ensures that scarce government resources are distributed only to those who truly need them. The Court thus finds that the FSA's interpretation is a "plausible construction" that "sensibly conforms to the [regulation's] purpose and wording." *See Ehlert*, 402 U.S. at 105, 91 S.Ct. 1319; *Northern Ind. Pub. Serv. Co.*, 423 U.S. at 15, 96 S.Ct. 172.

The plaintiff argues that an "ongoing eligibility" interpretation of section 1951.909 is erroneous when viewed against

---

**3.** While several of the plaintiff's arguments are dealt with below, his argument pertaining to the "current financial statement" section is best addressed here. The plaintiff argues that the requirement of current financial information is not a part of an eligibility determination, 7 C.F.R. § 1951.909(c), but rather part of a "feasability inquiry", 7 C.F.R. § 1951.907(e). The plaintiff is correct in making this distinction, but wrong in arguing that the lack of a "current financial state-

ment" clause in 1951.909(c) somehow eliminates a timeliness aspect of 1951.909(c). In recognizing the timeliness clause of 1951.907(e), the Court is *not* making the unreasonable conclusion that timeliness therefore applies to all aspects of the application process. Rather it is making the much more modest conclusion that a demand for timely information in determining feasibility evinces a general concern that decisions be based on current data.

various "neighboring provisions." Plaintiff's Brief at 29. The plaintiff first argues that, as another provision expressly contains an ongoing eligibility requirement, the absence of one in the loan servicing section suggests that the requirement was not intended. *See* 7 C.F.R. § 1951.957(a) (providing that an applicant's loan payment set-aside is premised on "continuing eligibility"). Using the same interpretive theory, the plaintiff next argues that two other FSA regulations provide for periodic updating of information, whereas no such requirement is made for loan servicing applications. *See* 7 C.F.R. § 1951.909(e)(3)(vii) (providing for a consideration of whether a borrower who is seeking a previously deferred loan has had an "increase in income and repayment ability" which would nullify his need for the loan); 1951.909(e)(3)(vi)(C) (providing for the creation of a quarterly status report on all farmers who have deferred refinancing offers).

Of the plaintiff's three citations, the Court finds that two are unsupportive of his interpretation argument. First, section 1951.909(e)(3)(vii) differs significantly in context from the eligibility provision. Section 1951.909(e)(3)(vii) requires the FSA, when evaluating a loan that has been previously deferred, to see if the borrower's financial situation has changed since the initial approval. One would normally expect a "changed circumstances" provision in situations (such as the reconsideration of a previously deferred loan) where a significant lapse of time is a *ubiquitous* issue. As loan servicing approval does not, as a matter of common practice and regulation, involve a significant lapse of time, one would not expect such a provision to be included in section 1951.909(c). Therefore, the absence of such a provision in 1951.909(c), even in light of its presence in 1951.909(e)(3)(vii), raises no presumption against ongoing eligibility.

The plaintiff's other citation, section 1951.909(e)(3)(vi)(C), also deals with loan deferrals and fails for the same reason described above. That section instructs the FSA Finance Office to provide the local satellite office with a "quarterly status report for each borrower who has received a deferral." Like the updating of financial information, this provision also makes perfect sense in the loan deferral context, but makes much less in a process much shorter in duration. Therefore, its absence in the eligibility context also raises no presumption against ongoing eligibility.

The plaintiff's third textual example, the "continuing eligibility" requirement of section 1951.957(a), is the only provision of its type cited by the plaintiff (or uncovered by the Court) in all of section 1951. Still, it *might* convince a particularly open minded linguist that the FSA's interpretation is "not be the best or most natural one." But that is not enough. *See Pauley,* 501 U.S. at 702, 111 S.Ct. 2524. The interpretation must be "plainly erroneous," a label that this Court does not deem appropriate in this case. It is myopic to conclude that an interpretation is plainly erroneous *just because* it fails a certain canon of interpretation. That is not to say that canons are irrelevant in such inquiries, they certainly are. But where an interpretation makes logical sense on its own, and indeed seems necessary to fulfill an agency's statutory obligations, the blind application of a canon is a foolish way to infer the reasonableness of a regulation's interpretation.

As a final note, the Court's holding today is supported by the weight of precedent. While the issue does not appear to have been widely considered, two cases are relevant. First, *Cooper v. Glickman* involved a farmer who was delinquent on his loan payments. 50 F.Supp.2d 489 (M.D.N.C.1999). Being financially distressed, the farmer inquired at his local FSA office as to the buyout price for the loans. After receiving a quote, a hurricane hit the farmer's property, resulting in a substantial insurance payment. This new influx of money, when reported to the FSA office, resulted in the farmer's buyout

price increasing dramatically. The farmer brought an action, claiming that the initial buyout price constituted a firm offer and was not subject to changed circumstances. The district court for the Middle District of North Carolina disagreed, opining that the use of changed circumstances was a

> reasonable method, ... especially in situations ... where the financial situation of an applicant has so significantly changed that to proceed with old financial data would inaccurately represent the actual financial position of a delinquent borrower and result in significant losses to the Government.

*Id.* at 505–05.

A second case is *Kinion v. United States*, 8 F.3d 639 (8th Cir.1993). *Kinion* also involved a farmer who was not only delinquent on his farm loans, but also the beneficiary of insurance proceeds during the loan buyout process. The farmer styled his complaint somewhat differently, arguing that the use of any information (which in this case happened to be "changed circumstance" information) after the buyout offer deadline had passed was inappropriate. *Id.* at 643. The Eighth Circuit disagreed, holding that the use of the new information "was not improper" and that a different holding would be contrary to the purposes of the statute and "endager[ ] the public's interest in minimizing financial loss to the government" *Id.* at 644.

These cases only strengthen the Court's decision on the FSA's eligibility interpretation. Having decided that issue, the Court now considers the length of time the FSA used to process the plaintiff's conservation contract.

## IV. The FSA's Delay in Loan Servicing

The plaintiff argues that the FSA acted arbitrarily, capriciously, and not in accordance with the law in delaying the approval of his loan servicing application. The defendant argues that its delay, if any, was not unlawful because (1) in the context of a conservation contract, the FSA is not sub-ject to the regular time restrictions of 1951.909(h), and (2) apart from the regulatory time restrictions, the delay did not amount to arbitrary and capricious behavior. After a review of the events of this case as well as the regulatory scheme for conservation contracts, the Court agrees with the defendant.

### A. Standard of Review

The Court's analysis is guided by the APA which directs this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Inasmuch as an interpretation of regulations is involved, the Court, as described in the preceding section, defers to the FSA's interpretation unless it is "plainly erroneous." *Seminole Rock*, 325 U.S. at 414, 65 S.Ct. 1215.

### B. The FSA's Delay

#### 1. The Regulatory Requirements

Section 1951.909 provides the process for evaluating basic loan servicing applications. With respect to time restrictions, that section commands the FSA to act on loan servicing applications and make refinancing offers "within 60 days." *See* 7 C.F.R. § 1951.909(h).

If the delinquent farmer is seeking a conservation contract, however, section 1951.909(a) directs the FSA to evaluate the application under Exhibit H, and then notify the applicant of the decision under section 1951.909(h). Exhibit H contains an extensive process for the evaluation of conservation contract applications. *See* 7 C.F.R. § 1951, subpart S, exhibit H. This extensive process is due to the fact that, with a conservation contract, the United States is actually taking a real property interest in the farmer's land. Thus, under Exhibit H, a "contract review team" must be established and sent to survey the land in person. *Id.* at part III. According to Exhibit H, this must be done *"to the extent practicable ...* within fifteen days" of

when the team is formed. *Id.* at part IV (emphasis added). After the site visit, the team must create a report "within thirty days" that details the land's conservation potential to the government. *Id.* Apart from this report, the land must be surveyed and appraised. From all of this information, the FSA calculates the amount of debt write-down available to the farmer and eventually finalizes the contract approval.

Thus, according to Exhibit H, a conservation contract requires *at least* 45 days of processing beyond what is required for a basic loan servicing request. This does not account for the appraisal, the survey, or the establishment of the contract review team—which is often composed of members of various local and state agencies. This alone raises a presumption that the time requirement in section 1951.909(h), which amounts to a couple of lines in a multifarious section, was not intended to apply to conservation contracts.

But the Court's decision does not stand on this presumption alone. It stands on the fair construction of Section 1951.909(h) as well. The 60–day requirement is contained in section 1951.909(h)(1), which is titled "Offer." Section 1951.909(h)(2), *not* part of the "Offer" section, is titled "Conservation contracts." That section contains no time requirement, but simply refers the FSA agent to Exhibit H, the conservation contract process exhibit. Viewing this arrangement of provisions, several conclusions can be made. The subject of conservation contracts seems to be explicitly carved out from the 60–day notification rule laid out in section 1951.909(h)(1). This section, though not containing its own timeline for notification, is nonetheless listed under the "Notification" title of the overall section, 1951.909(h). This suggests that the timeline for notification on conservation contracts is likely housed in Exhibit H, not 1951.909(h)(1). Exhibit H contains some provisions that address the schedule of contract consideration, but does not con-tain a provision commanding the FSA to communicate its decision within a particular period of time from the farmer's application.

Thus, the Court finds that the defendant did not act unlawfully in failing to communicate a decision to the plaintiff within 60 days.

### 2. The APA Requirements

■ Even though the Court does not find a violation of the 60–day requirement, it is still possible that the FSA acted arbitrarily or capriciously in not processing the plaintiff's application sooner than it did. The Court, however, fails to find any merit in this claim.

Before delving into the unreasonableness of the FSA's delay (if any), a moment should be spent defining the window of time worth considering. The plaintiff is claiming that, had the defendant processed his application on time, the new financial information would not have been considered and thus the application would have been approved. Thus, any alleged delay by the FSA that falls after the sale of the winery is irrelevant to the plaintiff (and thus the Court) because that delay could not have caused the alleged injury. For the purposes of this issue then, the delay under consideration extends from September 1995—when the plaintiff filed his application for a conservation contract—to December 1996—when the plaintiff sold an interest in his winery to Stroh's Brewery.

Reviewing the record, the Court finds that the FSA's failure to fully evaluate the plaintiff's application within 15 months did not constitute an arbitrary or capricious act. As described above, the conservation contract approval process is a complicated and arduous process. Even at its most expedient, it would last at least three months. While some aspects of the lengthy consideration in this case are unclear, there is little evidence that FSA was acting carelessly, much less capriciously. The record in this case contains the metic-

ulous notes of FSA employees during the application process. *See* Administrative Record at 232–64. The notes reveal that the plaintiff's application was addressed in a tenacious and methodical fashion. *Id.* Indeed, many of the note entries are separated by only a few days, indicating that the plaintiff's application received ongoing personal attention, not just a forgotten folder in the file cabinet. *See, e.g., id.* at 232, 256–58.

But perhaps the most compelling factor is that, approximately 12 months after he first sought a conservation contract, the plaintiff sought to have the amount of land in his application changed. *See* Administrative Record at 243, 257. Thus, the plaintiff is arguing to the Court that the FSA was arbitrary and capricious in not finalizing his contract within the three months after his change in the contract but before the deal with Stroh's Brewery. This is simply too fantastic for the Court to accept, and thus the Court finds that FSA behavior was not arbitrary and capricious.

## V. The Plaintiff's Remaining Claims Against the FSA

The Court declines to consider the plaintiff's remaining claims, all of which are allegations of procedural mistakes on the part of the FSA. The FSA may well have violated the APA in its handling of this matter, but its violations do not change the fact the plaintiff is not eligible for loan servicing. Thus, the Court's consideration of the eligibility issues has rendered the remaining issues moot.

## CONCLUSION

The Court is not blind to the apparent morass of procedure that has accompanied the plaintiff's application for loan servicing. If this case is representative of the others at the FSA, there is significant cause for concern. But the Court is also not blind to the law, specifically the rule of deference promulgated in *Seminole Rock.* Under such a rule, and on these facts, the agen-

cy's interpretation and denial of the plaintiff's application must stand.

An order consistent with this opinion shall issue this day.